**Deborah J. REBER, Plaintiff,**

v.

**PROVIDENT LIFE & ACCIDENT INSURANCE COMPANY, Defendant.**

**No. IP99–0099–C–T/G.**

United States District Court, S.D. Indiana, Indianapolis Division.

March 29, 2000.

996

James R. Fisher, Ice Miller Donadio & Ryan, Indianapolis, IN, for Plaintiff.

Mark E. Schmidtke, Hoeppner Wagner & Evans, Valparaiso, IN, for Defendant.

## ENTRY DISCUSSING PENDING MOTIONS

TINDER, District Judge.

This matter comes before the court on the following motions: Defendant Provident Life & Accident Insurance Company's ("Provident") Motion to Dismiss and Motion to Strike, seeking dismissal of the Complaint, or alternatively, seeking to strike the demand for extracontractual damages and a jury trial, on the grounds that the state law theories in the Complaint are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.;* and, Plaintiff Deborah J. Reber's Petition to Remand and alternative Motion for Leave to Amend Complaint, seeking a remand of this action on the grounds that the disability insurance contract at issue is not governed by ERISA and this court lacks federal question jurisdiction. After considering the motions and the submissions of the parties, the court finds as follows.

### I. Facts [1]

In 1986, Ms. Reber was employed by the California law firm or Haasis, Pope & Cor-

---

**1.** Both parties submit matters outside the pleadings. Therefore, while Provident's motion is presented as one arising under Federal Rule of Civil Procedure 12(b)(6), the court will treat it as a motion arising under Federal Rule of Civil Procedure 56. *See* FED. R. CIV. P. 12(b).

rell ("Law Firm").[2] The Law Firm provided her with disability coverage under a group insurance policy ("Group Policy"), issued by Paul Revere Insurance Company ("Paul Revere"). On April 1, 1986, Ms. Reber also became covered by the policy at issue in this case, an individual policy of disability insurance from Provident ("Provident Policy" or "Policy").

The Policy contains a "Salary Allotment Premium Payment" rider which provides:

In consideration of the Salary Allotment Agreement between your employer and us, we agree to accept Policy Premiums as billed to your employer.

The conditions of this rider are:

1. The policy will not continue in force beyond the time for which the premium is paid, subject to the grace period.

2. If your employer fails to pay the premiums when due because of clerical error or negligence, your insurance under the policy will not be prejudiced.

3. This rider will be void if:

   a. your employment with your employer ends;

   b. the Salary Allotment Agreement is terminated; or

   c. for any reason, your employer fails to pay premiums.

4. If this rider is voided, premiums will be due and payable as required in the policy.

(Compl., Ex. A at 14.) The "Salary Allotment Agreement" between the Law Firm and Provident provides that:

"[t]he Employer agrees as respects policies issued by the Insurance Company to certain individuals ... [t]o pay a portion of the required premiums and to make salary deductions of the remainder of the required premiums for such policies, and to remit such premiums to the Insurance Company when due...."

(Thompson Aff., Ex. A.) As a part of the agreement between the Law Firm and Provident, Provident discounted the premiums on the Policy by ten percent. (Thompson Aff. ¶ 3.) This discount was only available to eligible employees of the Law Firm by virtue of their employment. (Id. ¶¶ 2–3.) Also, because the Law Firm agreed to pay at least a portion of the premiums, Ms. Reber was provided with a higher level of coverage than would have been available absent her employment with the Law Firm. (Id.)

Between 1984 and 1989, Provident covered as few as four and as many as twenty of the employees of the Law Firm with various disability policies (including Ms. Reber). (Supplemental Aff. of Terry Thompson ¶ 2.) The premiums of each policy were billed to the Law Firm on a group billing statement. (Id.) When an individual's coverage was canceled, any premium refund was issued to the Law Firm. (Id.)

A Provident agent met with Ms. Reber, explained the Policy, took her application, and handled the entire application process. (Reber Aff. ¶¶ 2–4.) On her application, Ms. Reber stated that her employer would "pay for all disability coverage to be carried by [me] with no portion of the premium to be included in [my] taxable income." (Notice of Removal, Ex. A.) Ms. Reber never received a summary plan description, annual reports, or any other such documentation in connection with the Policy. (Reber Aff. ¶ 5.)

---

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). When considering a motion for summary judgment, the court must view the facts, and all the inferences drawn from those facts, in the light most favorable to the nonmovant. See Smith on Behalf of Smith v. Severn, 129 F.3d 419, 426 (7th Cir.1997); Frey v. Fraser Yachts, 29 F.3d 1153, 1156 (7th Cir.1994).

2. The court refers to the law firm as "Law Firm" because the Law Firm changed its name during the relevant period of time.

Later in 1986, Ms. Reber experienced the onset of a severe bladder dysfunction. Provident investigated her claim on the Policy and determined that she was totally disabled. Paul Revere also determined that she was totally disabled pursuant to the Group Policy. Likewise, Ms. Reber applied for, and received, Social Security disability benefits.

At that point, Ms. Reber had no further involvement with the Law Firm, and Provident paid disability benefits on the Policy directly to her. Pursuant to the Policy terms, Provident waived any premiums on the Policy while Ms. Reber was disabled.

In 1989, the Law Firm terminated its Salary Allotment Agreement with Provident. The Law Firm instructed Provident to cancel every policy listed on Provident's billing statement, including Ms. Reber's Policy (which had continued to be listed on the Law Firm's billing statement with a premium amount of "$0", pursuant to the waiver of premium provision contained in the Policy). The Law Firm went defunct in 1989, and had no further involvement with Provident or Ms. Reber.

Despite the termination of the Salary Allotment Agreement between the Law Firm and Provident, Provident continued to pay Ms. Reber benefits and continued to waive the Policy premiums.

Provident reviewed Ms. Reber's claim on a periodic basis. In June 1998, Provident terminated Ms. Reber's disability benefits.

On January 8, 1999, Ms. Reber filed the Complaint in Hamilton (Indiana) Superior Court, seeking damages for Provident's alleged breach of contract and bad faith termination of benefits. Provident removed the case to this court, alleging federal question jurisdiction under ERISA, on the grounds that the Policy is an ERISA employee welfare benefit plan. Provident then filed its Motion to Dismiss and Motion to Strike on the basis of ERISA pre-emption. Ms. Reber filed her Petition to Remand on the grounds that the Policy is not an ERISA plan. Ms. Reber also filed a Motion for Leave to Amend Complaint, in the event the court finds that the Policy is governed by ERISA.

## II. Discussion

The burden of showing that removal was appropriate rests upon Provident, as the party seeking the removal. *See Jones v. General Tire & Rubber Co.*, 541 F.2d 660, 664 (7th Cir.1976). The central issue in determining whether removal was appropriate is whether the Policy is part of an employee benefit plan that is subject to ERISA. ERISA generally applies only to employee benefit plans. *See* 29 U.S.C. § 1003(a). Provident contends that the Policy is part of an "employee welfare benefit plan," one of the two types of employee benefit plans covered by ERISA.[3]

ERISA defines an "employee welfare benefit plan" as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, ... benefits in the event of ... disability ....

29 U.S.C. § 1002(1). Case law has interpreted this definition as requiring five elements:

> (1) a plan, fund or program, (2) established or maintained, (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing ... disability ... benefits, (5) to participants or their beneficiaries.

*Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 738 (7th Cir.1986) (cit-

**3.** The other type of employee benefit plan covered by ERISA is an "employee pension benefit plan," which is defined at 29 U.S.C. § 1002(2).

ing *Donovan v. Dillingham*, 688 F.2d 1367, 1371 (11th Cir.1982)).

"ERISA is clearly a statute of general application, one that envisions inclusion within its ambit as the norm." *Cvelbar v. CBI Ill. Inc.*, 106 F.3d 1368, 1376 (7th Cir.1997) (quoting *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 933 (7th Cir.1989)), *overruled on other grounds by International Union of Operating Engineers, Local 150, AFL–CIO v. Rabine*, 161 F.3d 427 (7th Cir.1998); *Fiene v. V. & J Foods, Inc.*, 962 F.Supp. 1172, 1178 (E.D.Wis.1997) ("It is well-established that '[c]ourts must construe the definition of 'welfare benefit plan' broadly.'") (quoting *Gupta v. Freixenet, USA, Inc.*, 908 F.Supp. 557, 562 (N.D.Ill. 1995)) (citing *Brundage–Peterson v. Compcare Health Servs. Ins. Corp.*, 877 F.2d 509, 511 (7th Cir.1989)). "The question of whether a plan exists is one of fact which must be answered while considering all surrounding circumstances from the perspective of a reasonable person." *Gupta*, 908 F.Supp. at 562 (citing *James v. National Business Systems, Inc.*, 924 F.2d 718, 720 (7th Cir.1991)).

■ There is no dispute that with respect to the Provident Policy, the latter three elements of an "employee welfare benefit plan" are satisfied—i.e., the Law Firm satisfied ERISA's definition of an "employer",[4] and the Policy provided disability benefits to Ms. Reber, a "participant".[5] Provident argues that, in addition, the Policy is part of a "plan, fund, or program" and that the Law Firm "established or maintained" it.

In fleshing-out the meaning of a "plan" for ERISA purposes, the Seventh Circuit has stated:

In determining whether a plan, fund or program (pursuant to a writing or not) is a reality a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits.

*Diak v. Dwyer, Costello & Knox, P.C.*, 33 F.3d 809, 812 (7th Cir.1994) (quoting *Donovan*, 688 F.2d at 1373; citing *Ed Miniat, Inc.*, 805 F.2d at 738–39; other citations omitted). In applying this standard, the Seventh Circuit has noted that "[t]he [p]lan may adopt some of its essential provisions from sources outside itself", including "insurance policies that provide the [p]lan's funding." *Ed Miniat, Inc.*, 805 F.2d at 739; *see also Brundage–Peterson*, 877 F.2d at 511 ("The contingent feature of a true welfare benefits plan ... is unaffected by the delegation of administration of the plan to an insurance company—a delegation in fact contemplated by the statute.") (citation omitted); *Robinson v. Linomaz*, 58 F.3d 365, 368 (8th Cir.1995) ("[T]here is no requirement that the employer play any role in the administration of the plan in order for it to be deemed an EWBP under ERISA.") (citing *Donovan*, 688 F.2d at 1374); *Randol v. Mid–West Nat'l Life Ins. Co.*, 987 F.2d 1547, 1550–51 n. 5 (11th Cir.1993) ("[A] commercially purchased insurance policy under which the procedures for receiving benefits are all dictated by the insurance carrier can constitute a plan for ERISA purposes.").

In this case, a reasonable person can readily ascertain that the intended benefits of the Policy are disability benefits; the beneficiary of the Policy is Ms. Reber; the source of financing is Ms. Reber and the Law Firm; and, the procedures for receiving benefits are set forth in the Policy. Therefore, the Policy, and the supporting documents, fit within the definition of an ERISA "plan". *See Madonia v. Blue Cross & Blue Shield of Va.*, 11 F.3d 444, 447 (4th Cir.1993) ("[T]he parameters of [the employer's] plan are readily ascertainable: the intended benefit is health insurance

---

4. *See* 29 U.S.C. § 1002(5). Also, Ms. Reber concedes that the Paul Revere Group Policy, provided by the same Law Firm, was part of an ERISA plan.

5. *See* 29 U.S.C. § 1002(7).

coverage; the beneficiaries include [the employer's] employees who seek help with their health insurance payments; the source of financing is [the employer] and its employees; and the procedure for receiving benefits is submission of claims to the employees' own insurance companies. We therefore conclude that a sufficiently defined 'plan' exists."); *Randol,* 987 F.2d at 1550 ("The purchase of insurance at issue in this case fits within this definition of a § 1002(1) 'plan, fund, or program.' The intended benefits are, of course, the medical care provided under the insurance policy. The class of beneficiaries is composed of the workers who chose to purchase the group health insurance. The source of financing is the employee-paid premium supplemented by the monthly $75 employer contribution. Finally, the procedures for receiving benefits are those set out in the insurance policy.")

Lastly, the court must determine whether the Law Firm "established or maintained" the plan. Provident argues that the uncontroverted facts demonstrate that the Law Firm "established or maintained" the plan. As a part of the agreement between the Law Firm and Provident, Provident discounted the premiums on the Policy by ten percent—a discount that was only available to eligible employees of the Law Firm by virtue of their employment. Also, because the Law Firm agreed to pay at least a portion of the premiums, Ms. Reber was provided with a higher level of coverage than would have been available absent her employment with the Law Firm. And the Law Firm paid a portion of the only premium that was ever paid on the Policy. Also, there are facts indicating that the Law Firm's subsidy of disability benefits for Ms. Reber was part of a larger plan by the Law Firm to provide employee benefits. Between 1984 and 1989, Provident covered as few as four and as many as twenty of the employees of the Law Firm with various disability policies issued by Provident. The premiums of each policy were billed to the Law Firm on the same billing statement and when an indi-

vidual's coverage was canceled, any premium refund was issued to the Law Firm, rather than to the covered employee. Moreover, the Law Firm also provided Ms. Reber (and other employees) with disability coverage through a Paul Revere Group Policy that Ms. Reber acknowledges is governed by ERISA.

In response, Ms. Reber first argues that the court should not consider the Paul Revere Group Policy in determining whether the Provident Policy falls within ERISA's definition of an "employee welfare benefit plan." In support of her argument, she cites to *Slamen v. Paul Revere Life Ins. Co.,* 166 F.3d 1102, 1105 (11th Cir.1999) ("Slamen's disability insurance policy—which is not, by its terms, an ERISA plan—is not converted into an ERISA plan merely because Slamen also provides ERISA benefits to his employees.") (citation omitted). *Slamen* holds that a disability policy was not an ERISA plan where the plaintiff, a dentist, wholly owned his practice and was the only person covered. The primary basis for this holding is the well-established rule that "in order to establish an ERISA employee welfare benefit plan, the plan must provide benefits to at least one employee, not including an employee who is also the owner of the business in question." *Id.* at 1104 (citations omitted). The court also noted that "there is nothing in the record showing that the disability insurance policy [covering only the dentist, Slamen,] bears any relationship to the health and life insurance benefits that Slamen provides to his employees." *Id.* at 1105.

In this case, not only was Ms. Reber not the owner of the Law Firm, but there is evidence that the Provident Policy bears a relationship to the Paul Revere policy. Both policies were provided to the same employees and were designed to benefit those employees, *cf. id.* ("The first policy covers Slamen's employees as well as himself, while the second policy only covers Slamen and was not designed to benefit

Slamen's employees."); both policies provided the same type of benefit—disability insurance, *cf. id.* ("The two policies were purchased ... for different purposes."); both policies were billed to (using a single group bill), and subsidized by, the Law Firm; the coverage offered under both policies were only available by virtue of employment with the Law Firm; and, both policies were provided to Ms. Reber at close to the same time, *cf. id.* ("The two policies were purchased at different times...."). The major distinction between the two policies in this case (other than the fact that they provide different, albeit complementary, amounts of disability coverage) is the fact that the policies were offered by different insurers. In *Brundage–Peterson*, the Seventh Circuit discussed a benefit arrangement involving different two different insurers, and found the distinction to not be significant:

> The statute by its express terms encompasses the provision of such benefits by means of insurance, and once the employer elects that route his participation in the actual provision of the benefits is unlikely to be any greater than the employer's in this case. If this employer's arrangement is less common than we suppose, it was the plaintiff's burden to enlighten the district judge and us by presenting evidence concerning the character of the various employee welfare benefit arrangements that are in force. An employer who creates by contract with an insurance company a group insurance plan and designates which employees are eligible to enroll in it is outside the safe harbor created by the Department of Labor regulation. This is especially clear when in addition, as was done here, the employer helps defray the employee's insurance cost .... The fact that in this case the employer offered a choice of plans rather than a single plan can make no difference, for it is commonplace to offer employees benefit options. The fact that each plan was offered by a different insurer may introduce a bit of novelty but does not alter

our conclusion. The choice offered remained a distinctly finite one, resulting from contracts made by the employer with selected insurance companies, and is not the same as leaving the procuring of insurance entirely to the employee. The contracts 'established' a plan for specified employees having an elective feature which did not in our view affect its character as a plan.

*Brundage–Peterson*, 877 F.2d at 511. Therefore, while the court agrees with *Slamen*'s statement that an insurance policy is not converted into an ERISA plan merely because the employer also provides ERISA benefits to its employees, the court finds that in this case, the relationship between the Paul Revere Group Policy (which Ms. Reber concedes is governed by ERISA) and the Provident Policy constitutes at least some evidence that the Provident Policy was part of the Law Firm's employee benefit plan. *See Bellisario v. Lone Star Life Ins.*, 871 F.Supp. 374, 378–79 (C.D.Cal.1994).

But even if the court does not consider the Paul Revere Group Policy, there is substantial evidence indicating that the Law Firm established or maintained a plan. The facts surrounding the Law Firm's subsidy of the premiums and payment arrangement with Provident strongly indicates that the Law Firm had established or maintained a plan. *See Metropolitan Chicago Healthcare Council v. UNUM Life Ins. Co.*, 149 F.3d 744, 746 (7th Cir.1998) ("ERISA permits either the liability-insurance or the health-insurance approach. An employer ... could draw up a plan that promises specific benefits to the employees, and then purchase insurance to back up this promise.... But an employer just as easily could draw up a plan in which insurance is the promised benefit. Then the insurer owes a duty, not to indemnify the plan, but to provide the stated benefit to the employee, after the fashion of first-party insurance."); *Postma v. Paul Revere Life Ins. Co.*, No. 95 C 6575, 1998 WL 641335, at *4 (N.D.Ill. Sept.

10, 1998) ("An employer 'establishes or maintains' an insurance plan if an employer creates a contract with an insurer and pays its employees' premiums.") (citing *Brundage–Peterson*, 877 F.2d at 511 ("The statute by its express terms encompasses the provision of such benefits by means of insurance...."); *Lutheran Gen. Hosp., Inc. v. Massachusetts Mut. Life Ins. Co.*, No. 95 C 2504, 1996 WL 124449, at *2–*3 (N.D.Ill. Mar. 12, 1996)); *see also Robinson*, 58 F.3d at 368 ("[A]n employer's purchase of an insurance policy to provide health care benefits for its employees can constitute an [employee welfare benefit plan] for ERISA purposes."); *Madonia*, 11 F.3d at 447 ("Under [the] statutory definition [of an employee welfare benefit plan], employers may easily establish ERISA plans by purchasing insurance for their employees."); *Fugarino v. Hartford Life & Accident Ins. Co.*, 969 F.2d 178, 184 (6th Cir.1992) (stating that "the bare purchase of insurance ... may be evidence of the existence of an ERISA plan"); *Kidder v. H & B Marine, Inc.*, 932 F.2d 347, 353 (5th Cir.1991) ("[P]ayment of premiums on behalf of ... employees is 'substantial evidence that a plan, fund or program was established.'") (quoting *Donovan*, 688 F.2d at 1373); *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 241 (5th Cir.1990) ("[Employer] established and maintained the plan by purchasing the policy and paying the premiums directly to [the insurance company]. [Employer's] employees contributed, through payroll deductions, one-half of the monthly premium payments made to [the insurance company]; [the employer] paid the other half."); *cf. Brundage–Peterson*, 877 F.2d at 510–11 (holding that the employer created an ERISA plan when it: (1) paid for the employee's insurance; (2) contracted with the insurance company for coverage and eligibility requirements; and (3) collected and remitted the employee's dependent's premiums.).

In *Randol v. Mid–West National Life Insurance Co. of Tennessee*, 987 F.2d 1547 (11th Cir.1993), the court considered a similar factual situation faced by this court. The plaintiff, Randol, was employed as a mechanic at Ed's Tire Center, a small business wholly owned and operated by Edward Hurt. Hurt employed a total of three people. Randol and another employee decided to purchase medical insurance from Mid–West National Life Insurance Company. Hurt agreed to allow the premium payments to come from the Ed's Tire Center bank account and Hurt also decided to contribute $75 toward the cost of the monthly premium of the insurance. In other words, Hurt wrote a check for the full amount of the premium payment for each of the two employees and then deducted the cost of the premium, less his $75 contribution, from each of the employees' paychecks. Hurt testified that he did not intend to set up an insurance plan or an employee benefit program and he did not comply with any ERISA reporting requirements. The insurer regarded Randol as an individual applicant for insurance. The insurer never sought or received any application from Ed's Tire Center and Randol's application mentioned the Tire Center only for the purpose of noting his place of employment. Had the Tire Center failed to make a premium payment, Mid–West would have contacted Randol rather than the company about the delinquency. When the policy was canceled, Mid–West sent the refund check directly to Randol. *See id.* at 1549–50.

The issue faced by the *Randol* court was "whether the insurance policy at issue qualifies as an 'employee benefit plan' for ERISA purposes." *Id.* at 1550. The court first held that the insurance plan qualifies as a "plan, fund, or program," as that term is used in 29 U.S.C. § 1002(1). The court then stated:

We hold that through his actions the employer in this case has 'maintained' the plan within the meaning of ERISA. The employer wrote the first check purchasing the policies, established a system whereby the premiums would be paid monthly by means of a bank draft

on the corporate account, contributed $75 per employee per month toward the premiums, and collected from the employees the balance of the premiums through a withholding system. Moreover, the employer did the foregoing in order to facilitate his employees' obtaining health coverage. We find that these undisputed facts amply demonstrate that the employer 'maintained' the plan.

*Id.* at 1551.

Likewise, in Ms. Reber's case, the Law Firm wrote the check that purchased Ms. Reber's Policy, and established a system whereby the Law Firm would pay the premiums, contribute a portion of the premium amount and collect the balance of the premium through a payroll withholding system. Clearly, the Law Firm went to this effort in order to facilitate its employees' obtaining disability coverage. Indeed, the facts here make a more compelling case than *Randol* for finding that the employer maintained the plan, because when the Provident policies were canceled, the refund checks were not sent to the employees (as in *Randol*), but were sent to the Law Firm. Moreover, the Law Firm made this arrangement with more employees (up to twenty employees at any given time) than did the employer in *Randol* (only two employees).

In *Madonia v. Blue Cross & Blue Shield of Virginia*, 11 F.3d 444 (4th Cir.1993), the Fourth Circuit faced similar facts and found that the employer had "established" a plan:

> [The employer's] actions are more than sufficient to show the 'establishment' of a plan.... [The employer] made direct payments to [the insurance company] for [employee's] premiums and then deducted only one-third of the insurance cost from [employee's] pay.... This arrangement not only required [employer] to spend its corporate funds on employee insurance, but also involved additional administrative tasks: adjusting salaries, making payroll deductions, and taking

corporate tax deductions to reflect these employee fringe benefits.

*Id.* at 447.

The court notes that the Law Firm only made a single, small payment towards the Policy (only $15.58 was paid to Provident—a portion of which was contributed by the Law Firm and the remainder was deducted from Ms. Reber's pay). Shortly after that initial payment, Ms. Reber became totally disabled. Therefore, pursuant to the terms of the Policy, no more premiums were due. However, the court does not find the fact that only one payment was made to be significant in determining whether the Law Firm established or maintained a plan with the Policy at its center. For years after she became disabled, Ms. Reber's name continued to appear on Provident's billing statement to the Law Firm (with the amount due being "$0.00"), indicating that she was still considered to be a participant in the original program with the Law Firm—despite the fact that she no longer worked for the Law Firm because she was totally disabled. Ms. Reber has failed to offer a reason why the situation would be significantly different if she worked for the Law Firm for a period of years, continuing under the same payment arrangement as was established in 1986, before becoming disabled.

In arguing that the Law Firm did not establish or maintain the plan, Ms. Reber relies upon *Taggart Corp. v. Life & Health Benefits Administration, Inc.*, 617 F.2d 1208 (5th Cir.1980), which contains the following statement: "Considering the history, structure and purposes of ERISA, we cannot believe that the Act regulates bare purchases of health insurance where, as here, the purchasing employer neither directly nor indirectly owns, controls, administers or assumes responsibility for the policy or its benefits." *Id.* at 1211.

With respect to this statement in *Taggart*, the Seventh Circuit has stated:

> The *Donovan* court rejected *Taggart* to the extent that case implied 'that an employer or employee organization that

only purchases a group health insurance policy or subscribes to a [multiple employer plan] to provide health insurance to its employees or members cannot be said to have established or maintained an employee welfare benefit plan' .... *Donovan* does not hold that if the only employer activity is the purchase of insurance, an employee benefit plan results only if a substantial percentage of a class of employees are beneficiaries. *Ed Miniat,* 805 F.2d at 740 (citation omitted). In *Taggart,* the employer had simply informed its employees of the availability of group health insurance and had established a system whereby the monthly premium would be deducted from the paycheck of the one employee who chose to participate. The employer did not subsidize purchase of the policy. As the court in *Randol* stated,

> [t]he facts of the instant case differ significantly from those of *Taggart* in that here the employer not only established a system for withholding premiums from employee wages and paying them directly to the carrier, but also contributed $75 per employee toward the monthly premium and did so for the purpose of helping the employees obtain health insurance coverage. We hold that such conduct constitutes 'maint[enance of] ... [a] plan, fund, or program ... for the purpose of providing[,] ... through the purchase of insurance[,] ... medical, surgical, or hospital care or benefits' within the meaning of 29 U.S.C. § 1002(1).

987 F.2d at 1552. In this case, as in *Randol,* Employer subsidized the purchase of the Policy at issue.

And even the Fifth Circuit has stated that "reliance on *Taggart* for the proposition that a 'bare bones' insurance policy does not amount to an ERISA plan is misplaced." *Memorial Hosp. Sys. v.*

*Northbrook Life Ins. Co.,* 904 F.2d 236, 241 (5th Cir.1990). The court continued:

> Although we held in *Taggart* that the purchase of an insurance policy does not, in and of itself, establish the existence of an ERISA plan, we certainly did not hold ... that an employer's purchase of health insurance offers no evidence of an intent to provide such a plan. We agree with the reasoning of the Eleventh Circuit that
>
>> the purchase of insurance does not conclusively establish a plan, fund, or program, but the purchase is evidence of the establishment of a plan, fund, or program; the purchase of a policy or multiple policies covering a class of employees offers substantial evidence that a plan, fund, or program has been established.

*Id.* at 242 (quoting *Donovan,* 688 F.2d at 1373).

Ms. Reber also relies upon *Wayne Chemical, Inc. v. Columbus Agency Service Corp.,* 567 F.2d 692 (7th Cir.1977), which states:

> An employer does not become a participant in, or establish or maintain, a plan by applying for insurance and paying premiums for what it understands to be insurance without any knowledge that the plan exists. Establishing, maintaining, or participating in a plan requires an intent, which presupposes an awareness of the existence of the plan.

*Id.* at 699. In *Wayne Chemical,* the court determined that a group health insurance policy was not an ERISA plan because it was provided by an "intermediate broker" under a multiple employer trust agreement in which the employer neither knew about nor agreed to participate.[6] By contrast, in Ms. Reber's case, the Law Firm dealt directly with Provident in establishing its plan. Thus, there can be no issue concerning whether the Law Firm had

---

**6.** The only alleged "employee benefit plan" that the court considered was the multiple employer insurance trust. The issue in this case—whether the employer's purchase of a group insurance policy for its employees could itself be the foundation of an "employee benefit plan"—was not raised or considered by the court. *See id.* at 698–99.

knowledge of its arrangement with the insurance company and the terms of the plan.

Ms. Reber uses the above-quoted language in *Wayne Chemical* as a basis for arguing that Employer did not express an "intent" to create a plan because it did not issue an ERISA "summary plan description" and it did not control the management or operation of the Policy. (Br. in Opp'n to Mot. to Dismiss and in Supp. of Petition to Remand at 16.) However, in *Ed Miniat,* decided ten years after *Wayne Chemical,* the Seventh Circuit indicates that "the necessary intent on the part of the corporation" to establish an ERISA plan is simply, "to provide benefits for its employees." 805 F.2d at 741. In this case, the only intent that reasonably can be inferred from the Law Firm's purchase of Provident disability policies for numerous employees is an intent "to provide benefits for its employees." [7]

Further, Ms. Reber's contention that the above-quoted language in *Wayne Chemical* establishes a requirement that a written "summary plan description" must be issued, or that an employer must control the management or operation of the plan, has been implicitly refuted by subsequent Seventh Circuit cases. *See Doe v. Blue Cross & Blue Shield United of Wis.,* 112 F.3d 869, 876 (7th Cir.1997) ("[T]here needn't be … [a] written plan….") (citing *Scott v. Gulf Oil Corp.,* 754 F.2d 1499, 1503–04 (9th Cir.1985) ("Although ERISA contains numerous requirements that a plan must adhere to … these requirements are not part of the definition of 'plan.' Failure to meet these requirements does not exempt Gulf from coverage by ERISA. Such failure merely indicates a failure by Gulf to comply with ERISA. Were such failure to exempt Gulf from coverage by ERISA, employers could escape ERISA's coverage merely by failing

to comply with its requirements.")); *Diak v. Dwyer, Costello & Knox, P.C.,* 33 F.3d 809, 811 (7th Cir.1994) ("A plan need not be in writing to be covered by ERISA so long as the plan is a reality, meaning something more than a mere decision to extend benefits.") (citing *James v. National Business Systems, Inc.,* 924 F.2d 718, 719 (7th Cir.1991); *Ed Miniat, Inc.,* 805 F.2d at 739; *Donovan,* 688 F.2d at 1372); *Brundage–Peterson,* 877 F.2d at 511 ("The contingent feature of a true welfare benefits plan … is unaffected by the delegation of administration of the plan to an insurance company—a delegation in fact contemplated by the statute.") (citation omitted); *Ed Miniat, Inc.,* 805 F.2d at 739 ("The [p]lan may adopt some of its essential provisions from sources outside itself", including "insurance policies that provide the [p]lan's funding."). The court notes that in the twenty-three years since *Wayne Chemical* was decided, the reading of the case urged by Ms. Reber has not been adopted by any subsequent court. *Cf. Eichner v. Celtic Life Ins. Co.,* 73 Ohio App.3d 281, 596 N.E.2d 1124, 1126 (1991) ("Despite appellants' reliance on *Wayne Chemical* …, neither the United States Supreme Court cases interpreting ERISA, nor the statutes or regulations promulgated thereunder, require an employer to specifically state in a written employee welfare benefit plan, or in an enumerated administrative scheme, his specific intention to conform with the requirements of ERISA.").

Ms. Reber also relies upon *New England Mutual Life Insurance Co., Inc. v. Baig,* 166 F.3d 1 (1st Cir.1999), which states:

> New England Mutual argues that an employer's reimbursement of premiums paid directly by an employee should constitute substantial evidence of the exis-

---

7. There is no suggestion that the Law Firm may have been purchasing the policies as a "tax scheme," as in *Ed Miniat. See* 805 F.2d at 741. There is also no suggestion that the Law Firm may have established the plan as

"merely a proprietary insurance venture designed to take advantage of the void created by ERISA's preemption of state regulation," as in *Wayne Chemical. See* 567 F.2d at 699.

tence of an ERISA plan. The policy at issue here was not initially established by a contractual arrangement between Cardiology Associates and New England Mutual; rather, Baig made the initial purchase directly. Baig paid the premiums directly to New England Mutual. The policy was an individual policy covering only Baig himself. Under these particular circumstances, the reimbursement by his employer of premiums paid directly by Baig did not create a plan under ERISA.... When an employer deals directly with the insurer and actually purchases an insurance policy for an employee, there may be sufficient participation to meet the 'established or maintained' requirement under ERISA. On the other hand, an employer who simply pays its employees enough so that the employees are encouraged on their own to buy insurance policies could not be thought to have established or maintained any policy that any individual employee might purchase.

*Id.* at 4 (quotation omitted). *Baig* is inapposite because in this case, the Law Firm established a contractual relationship with Provident (i.e., the Salary Allotment Agreement) before Ms. Reber did, and Ms. Reber's purchase of the Policy was done through the Law Firm and was subsidized by the Law Firm. *See id.* at 4 n. 3 (distinguishing cases in which "direct payments of premiums [were made] by the employer to the insurer, with the payments either made out of employer funds, or collected from multiple employees and jointly submitted by the employer").

Ms. Reber also cites *Grimo v. Blue Cross/Blue Shield of Vermont,* 34 F.3d 148 (2nd Cir.1994). In *Grimo,* the court stated:

At least where the employer has made a decision not to fund the plan for the indefinite future and has made no contributions during the period in which the triggering event may have implicated the policy's coverage, a past contribution alone does not indicate that an ERISA plan has been 'maintained.'

*Id.* at 153. Unlike the employer in *Grimo,* the Law Firm in Ms. Reber's case made a decision to fund the Policy for the indefinite future (and indeed, the Law Firm did continue the funding until it went defunct), and the Law Firm contributed a portion of the premium "during the period in which the triggering event"—the onset Ms. Reber's disability—occurred. Further, the *Grimo* court concluded by stating:

We emphasize that we hold only that any employer contribution made in the past, no matter how long ago or under what circumstances, does not ... demonstrate that an employer has 'established or maintained' the plan under 29 U.S.C. § 1002(1). Further elaboration of the significance of prior contributions must await a more complete factual record.

*Id.* In this case, the record is more developed, and the evidence of the Law Firm's establishment and maintenance of the plan is far greater.

Ms. Reber argues that finding that the Policy was part of an ERISA plan does not comport with the Congressional purpose of ERISA.

In passing ERISA, Congress's purpose was twofold: to protect employees and to protect employers. Congress wanted to safeguard employee interests by reducing the threat of abuse or mismanagement of funds that had been accumulated to finance employee benefits while at the same time safeguarding employer interests by eliminating the threat of conflicting and inconsistent State and local regulation of employee benefit plans.

*Demars v. Cigna Corp.,* 173 F.3d 443, 446 (1st Cir.1999) (citing, *inter alia, Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 15, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987); *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 657, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995)).

Ms. Reber argues, quite correctly, that neither concern is implicated in this case. Because Ms. Reber became totally disabled after only one premium payment had been made, and the Law Firm has since become defunct, there was very little threat of abuse or mismanagement of accumulated funds by the Law Firm (at least with respect to Ms. Reber's funds). Further, there is no indication that the Law Firm was ever under the threat of conflicting and inconsistent State and local regulation of employee benefit plans—especially now that the Law Firm has been defunct for many years. For many years, the only entity that has had a true financial stake in Ms. Reber's Policy (other than Ms. Reber herself) has been Provident. "Yet Congress placed into ERISA an express disavowal of any intent to regulate insurers qua insurers." *Demars*, 173 F.3d at 446 (citing 29 U.S.C. § 1144(b)(2)).

But in this case, the reason Congressional intent appears to be frustrated lies in the text of the statute. ERISA expressly provides that a plan may be established using insurance. *See* 29 U.S.C. § 1002(1) (employee welfare benefit plan may be established or maintained "through the purchase of insurance"); *Ed Miniat, Inc.*, 805 F.2d at 739 ("The [p]lan may adopt some of its essential provisions from sources outside itself", including "insurance policies that provide the [p]lan's funding."). And the case law indicates that an employer may delegate many of its administrative responsibilities to an insurance company. *See Brundage–Peterson*, 877 F.2d at 511 ("The contingent feature of a true welfare benefits plan ... is unaffected by the delegation of administration of the plan to an insurance company—a delegation in fact contemplated by the statute.") (citation omitted); *Robinson v. Linomaz*, 58 F.3d 365, 368 (8th Cir.1995) ("[T]here is no requirement that the employer play any role in the administration of the plan in order for it to be deemed an EWBP under ERISA.") (citing *Donovan*, 688 F.2d at 1374); *Randol v. Mid–West Nat'l Life Ins. Co.*, 987 F.2d 1547, 1550–51 n. 5 (11th Cir.1993) ("[A] commercially purchased insurance policy under which the procedures for receiving benefits are all dictated by the insurance carrier can constitute a plan for ERISA purposes."). Further, the fact that the statute defines an "employee welfare benefit plan" as being "established *or* maintained" (rather than, "established *and* maintained") by an employer, allows for a situation that exists here, where an employer "establishes" a plan, goes defunct, and many years later, the plan is still subject to ERISA.[8] *Cf. Massachusetts*

---

8. Because of this language in ERISA, the court rejects Ms. Reber's argument that even if the Policy were part of an ERISA plan when issued, it was not a part of an ERISA plan when Provident denied her claim. If an employer "establishes" a plan, and that plan continues unchanged (as the Policy did) even after the employee ceases to work for the employer, the plan is still governed by ERISA. *See Massachusetts Cas. Ins. Co. v. Reynolds*, 113 F.3d 1450, 1453 (6th Cir.1997).

In support of her argument, Ms. Reber cites to five cases, which all involve insurance policies that were purchased solely by employees, *after* their employment ceased. *See Demars v. Cigna Corp.*, 173 F.3d 443, 444, 446–47 (1st Cir.1999); *McCale v. Union Labor Life Ins. Co.*, 881 F.Supp. 233, 234 (S.D.W.Va.1995); *Vaughn v. Owen Steel Co., Inc.*, 871 F.Supp. 247, 248–49 (D.S.C.1994); *Mimbs v. Commercial Life Ins. Co.*, 818 F.Supp. 1556, 1558 (S.D.Ga.1993). In this case, by contrast, the Policy was purchased and subsidized by the Law Firm (rather than solely by the employee as Ms. Reber began her employment there (rather than after her employment ceased), and the Policy continued in force, unchanged, after the Law Firm went defunct.

Moreover, the court notes that the cases cited by Ms. Reber do not appear to represent the majority position with respect to conversion policies purchased after employment ceases. *See, e.g., Painter v. Golden Rule Ins. Co.*, 121 F.3d 436, 439–40 (8th Cir.1997) (policies derived from ERISA plans continue to be governed by ERISA even after conversion upon termination of employment—"This conclusion is consistent with the overwhelming majority of preemption decisions involving conversion policies and the ERISA plans which gave them birth."); *Peterson v. American Life & Health Ins. Co.*, 48 F.3d 404, 408 (9th Cir.1995) (same); *Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1346–47 (11th Cir.1994) (same); *Howard v. Gleason*

*Cas. Ins. Co. v. Reynolds,* 113 F.3d 1450, 1453 (6th Cir.1997) (when employer provided an individual disability policy as part of an ERISA plan, and the policy remained in force without change after employee left employer, policy was still governed by ERISA).

So while the court agrees that finding an ERISA-governed plan in this case does not appear to advance some of the underlying objectives of ERISA (although it may well advance at least one[9]), the court is bound by the statute itself. As the Seventh Circuit has stated in a slightly different context:

> Unfortunately ERISA, a statute primarily concerned with guaranteeing pension benefits, has with little forethought as far as we can see taken a large class of simple contract cases, involving claims against unfunded employer-administered welfare plans, dumped them into federal court, and made their resolution complicated and uncertain by subjecting them to both federal statutory and federal common law.

*Miller v. Taylor Insulation Co.,* 39 F.3d 755, 761 (7th Cir.1994).

■ Ms. Reber's final argument is that ERISA's coverage does not extend to the Law Firm because the Law Firm's business did not affect interstate commerce to the degree required by ERISA's jurisdictional limit. ERISA's coverage is limited to plans established by employers engaged in "industry or activity affecting commerce." 29 U.S.C. § 1003(a); *see also* 29 U.S.C. § 1002(12) ("The term 'industry or activity affecting commerce' means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce, and includes any activity or industry 'affecting commerce' within the meaning of the Labor Management Relations Act, 1947, 29 U.S.C. § 141 *et seq.,* or the Railway Labor Act, 45 U.S.C. § 151 *et seq.*"). "When Congress uses the term 'activity affecting commerce,' it is an expression of Congress' intent to regulate 'within the full sweep of its constitutional authority.'" *Winterrowd v. David Freedman and Co., Inc.,* 724 F.2d 823, 825 (9th Cir.1984) (quoting *Polish Nat'l Alliance v. NLRB,* 322 U.S. 643, 647, 64 S.Ct. 1196, 88 L.Ed. 1509 (1944)); *see also Smart v. State Farm Ins. Co.,* 868 F.2d 929, 933 (7th Cir.1989) ("ERISA applies to any employee benefit plan established or maintained by an employer 'engaged in commerce or in any industry or activity affecting commerce' .... ERISA is clearly a statute of general application, one that envisions inclusion within its ambit as the norm.").

According to Ms. Reber, the Law Firm employed six or seven attorneys, who practiced only in California, and only served California clients. (Reber Aff. ¶ 7.) Therefore, she argues that the Law Firm did not affect interstate commerce to the degree required by ERISA's jurisdictional limit.[10]

---

*Corp.,* 901 F.2d 1154, 1157–58 (2nd Cir.1990) (same); *Klosterman v. Western Gen. Management, Inc.,* 805 F.Supp. 570, 573–74 (N.D.Ill. 1992) (same).

9. Other objectives of ERISA were cost-containment and the allowance of employer flexibility. *See* Senator Jacob K. Javits, *Address at the Briefing Conference on Pension and Employee Benefits* (Sept. 19, 1974), *quoted in* Michael S. Gordon, *Overview: Why Was ERISA Enacted?, in* SENATE SPECIAL COMM. ON AGING, 98TH CONG., 2D SESS., THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974: THE FIRST DECADE 25 (Comm. Print 1984); Peter J. Wiedenbeck, *Erisa's Curious Coverage,* 76 WASH. U. L.Q. 311 (1998). Congress's

other purposes (i.e., protecting employees from mismanagement of funds and protecting employers from inconsistent laws) could hardly be achieved if it made the administrative burdens so costly and inflexible that employers would simply decline to sponsor benefit plans. For instance, by allowing insurance companies to perform most of the administrative duties under a plan, Congress encourages smaller employers to offer plans that otherwise would be too expensive for them to provide. In this way, finding that the plan in this case is subject to ERISA furthers at least some of the goals of Congress.

10. The court notes that Ms. Reber concedes that the Paul Revere Group Policy offered by the Law Firm is governed by ERISA. There-

In support, Ms. Reber cites *Sheffield v. Allstate Life Insurance Co.,* 756 F.Supp. 309 (S.D.Tex.1991), which holds that the benefit plan of a two-person firm, which managed the estates of two Texas families, did not affect interstate commerce to the degree required by ERISA's jurisdictional limit. The holding of *Sheffield* rests upon citation to three cases—*Burke v. Ford,* 377 F.2d 901 (10th Cir.1967); *NLRB v. Bill Daniels, Inc.,* 202 F.2d 579 (6th Cir.1953); *NLRB v. Shawnee Milling Co.,* 184 F.2d 57 (10th Cir.1950)—two of which were reversed by the Supreme Court. *See Burke v. Ford,* 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967) ("[I]t is well established that an activity which does not itself occur in interstate commerce comes within the scope of the Sherman Act if it substantially affects interstate commerce.") (per curiam); *NLRB v. Daniels,* 346 U.S. 918, 74 S.Ct. 305, 98 L.Ed. 413 (1954). More importantly, its holding rests upon a misunderstanding of how a court should analyze a statute such as ERISA, which only requires that the activity to "affect" commerce.

In *Usery v. Lacy,* 628 F.2d 1226 (9th Cir.1980), Judge (now, Justice) Kennedy explained:

> It may be helpful to contrast here two of the principal formulations of statutory jurisdiction that have evolved from the congressional history of regulating the employment relation. If a statute covers businesses 'in commerce,' a fairly specific showing must be made of a connection between the particular employer regulated and interstate commerce....
>
> On the other hand, a statute may require only that the particular business 'affect' commerce.... In such cases there is statutory jurisdiction so long as the business is in a class of activity that as a whole affects commerce.

*Id.* at 1228 (citing *NLRB v. Reliance Fuel Oil Corp.,* 371 U.S. 224, 83 S.Ct. 312, 9 L.Ed.2d 279 (1963); *Polish Nat'l Alliance,*

322 U.S. at 647–48, 64 S.Ct. 1196; *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 34–39, 57 S.Ct. 615, 81 L.Ed. 893 (1937)). The Seventh Circuit has adopted this same reading of an arson statute requiring proof that the burned property was "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." *United States v. Jones,* 178 F.3d 479, 480 (7th Cir.1999) (quoting 18 U.S.C. § 844). The court stated:

> [T]he defendant ... was wrong to argue that a substantial effect on commerce had to be established from his particular arson; or from arsons of commercial buildings in Portage, Wisconsin; or from arsons of commercial buildings generally. 'Arsons of buildings' substantially affect interstate commerce.... Cases such as *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), conclude that residential property in the aggregate substantially affects interstate commerce. *McLain* holds that an agreement among a few brokers to fix commissions on sales of residential property in New Orleans thus is within the commerce power.

*Id.* at 481 (citing *Goldfarb v. Virginia,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) (attorneys' agreement on fees for residential real estate title searches is within commerce power); *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991) (exclusion of a single physician from one hospital is within the commerce power because the provision of health care in the aggregate significantly affects commerce)).

There can be no doubt that the practice of law in the aggregate significantly affects commerce. *See Goldfarb,* 421 U.S. at 788, 95 S.Ct. 2004 ("In the modern world it cannot be denied that the activities of lawyers play an important part in commercial intercourse, and that anticompetitive activ-

---

fore, it is inconsistent for her to also argue that the Law Firm is not subject to Congress's

commerce powers for the purpose of the Provident Policy.

ities by lawyers may exert a restraint on commerce."); *see also Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 281, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985) ("[T]he practice of law is important to the national economy. As the Court noted in *Goldfarb,* the 'activities of lawyers play an important part in commercial intercourse.' ").

The court has been able to locate only one case that addresses this particular issue. *See Miller v. Travelers Ins. Co.,* 723 F.Supp. 1345 (E.D.Mo.1989). There the court stated:

> As the statutory language indicates, ERISA's coverage is based on the type of activity the employer engages in, rather than the actual sphere of a particular employer's activities: i.e., whether, in the instant case, the practice of law is an 'industry or activity affecting commerce.' The extent of interstate communication, travel and commerce necessarily involved in the practice of law today persuades the Court that a law firm employer is within the intended scope of ERISA's coverage of employee benefit plans.

*Id.* at 1346. This court agrees that a law firm employer affects interstate commerce to the degree required by ERISA's jurisdictional limit.

After considering the evidence and arguments of the parties, the court concludes that the Provident Policy is part of an "employee welfare benefit plan" as the term is defined in ERISA. The next issue is whether the claims in Ms. Reber's Complaint are preempted by ERISA.

ERISA's preemption clause provides, with one unrelated exception, that "the provisions of [ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. § 1144(a); *see also* 29 U.S.C. § 1144(c)(1) ("The term 'State law'

includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State."). "[T]he express pre-emption provisions of ERISA are deliberately expansive . . . ." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 45–46, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (citation omitted). "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983).

■ Ms. Reber's Complaint alleges state law claims of breach of contract and bad faith termination of benefits. The basis of these claims is the processing of her claim for benefits under the Policy. All of her claims "relate to" the Policy, within the meaning of ERISA's preemption clause.[11] *See, e.g., Pilot Life Ins. Co.,* 481 U.S. at 47–48, 107 S.Ct. 1549 (state law claims for breach of contract, bad faith and fraud in the processing of benefits preempted by ERISA); *Panaras v. Liquid Carbonic Indus. Corp.,* 74 F.3d 786 (7th Cir.1996) (state law breach of contract claims preempted by ERISA); *Tomczyk v. Blue Cross & Blue Shield United of Wis.,* 951 F.2d 771 (7th Cir.1991) (state common-law claims of bad faith, breach of contract, and tortious interference with contract preempted by ERISA). Therefore, Ms. Reber's state law claims are preempted by ERISA.

### III. Conclusion

The Policy is part of an "employee welfare benefit plan" that is governed by ERISA. The state law claims in the Complaint "relate to" the Policy and are therefore preempted by ERISA. Provident's Motion to Dismiss will be **GRANTED,** and Ms. Reber's Petition to Remand is **DENIED.** No order of dismissal will be issued at this point, because the court finds that Ms. Reber's Alternative Motion for

---

11. Indeed, Ms. Reber does not even argue that if the Policy is part of an ERISA plan, her state law claims do not "relate to" the plan.

Leave to Amend Complaint should be **GRANTED**. Ms. Reber will have **THIRTY (30) DAYS** from the date of this Entry to amend her Complaint. If no amended complaint is filed by that time, the court will issue an order of dismissal. Provident's Motion to Strike the claim for extra-contractual damages and the demand for jury trial is **DENIED** as moot. After Ms. Reber files her amended complaint, Provident may reassert its motion to strike if appropriate.