Harold G. DEIBLER

v.

UNITED FOOD AND COMMERCIAL WORKERS' LOCAL UNION 23, Appellant.

No. 91–3492.

United States Court of Appeals, Third Circuit.

Argued March 6, 1992.

Decided Aug. 17, 1992.

Richard D. Gilardi, Gilardi & Cooper, Edward J. Kabala (argued), Kabala & Geeseman, James R. Reehl, Pittsburgh, Pa., for appellant.

Pamela M. Schiller (argued), Blaufeld & Schiller, Pittsburgh, Pa., for appellee.

Before: STAPLETON and MANSMANN, Circuit Judges, and POLLAK, District Judge *.

OPINION OF THE COURT

STAPLETON, Circuit Judge:

I.

Plaintiff-appellee Harold Deibler was employed by the defendant-appellant local union for nineteen years. Some months before he was discharged in 1985, the union terminated its longstanding severance pay policy. Deibler was subsequently denied severance pay. He brought this action under the Employee Retirement Income Security Act of 1974 (ERISA), claiming that the union was legally obligated to pay him these benefits. The district court agreed. Because the severance policy was lawfully

terminated before Deibler's discharge, we will reverse.

II.

Unless otherwise noted, the following facts are undisputed. In a meeting held in November 1968, the Executive Board of United Food and Commercial Workers' Local Union No. 590 ("Local 590") instituted a severance pay policy for union officers. The minutes of that meeting reflect the following:

> Brother Hormell recommended that any paid officers leaving the union for retirement or any other valid reason shall be paid a severance pay based on one weeks [sic] salary for each year of service with a maximum of 25 years. Motion was made by Brother Hormell and seconded by Brother King. Discussion followed. Motion carried.

Appendix (hereinafter "A.") at 128.

In approximately August 1982, Deibler claims that the Executive Board of Local 590 converted a fund set aside for strike benefits to a fund earmarked for the payment of severance benefits. These funds were placed in an account at Equibank in Pittsburgh, entitled "Amalgamated Food Employees Union Local Number 590 AFL–CIO Organizational and General Trust." A. at 144. The 1983 financial statement for this account bears the notation, "Equibank hereby certifies that the foregoing statement furnished pursuant to 29 C.F.R. 2520.103–5(c) is complete and accurate", followed by the signature of an Equibank accounting section manager. Supplemental Appendix (hereinafter "S.A.") at 18. The federal regulation to which this notation refers sets out reporting requirements for banks holding ERISA plan assets.[1]

In December 1982, Local 590 signed a merger agreement with two other Locals, Nos. 1407 and 424, to form Local Union No.

---

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Although the funds in the Equibank account may have been earmarked for severance pay, apparently no severance funds were ever paid out of this account. This is true despite the fact that at least four union officers retired and received severance pay between 1982 and the termination of the policy in 1984. On the other hand, the funds in the Equibank account were not used for any other purpose by union officials.

23 ("Local 23"). As part of this merger, the severance pay policy was modified to provide a benefit equal to two weeks' pay for each year of service, up to the same 25 year maximum. Otherwise the terms of the policy remained unchanged.[2]

In the years following the merger, Local 23 experienced financial difficulties. As a result of these problems, the United Food and Commercial Workers' International Union imposed a trusteeship on the local in order to implement cost-cutting measures. Carl Huber was appointed Deputy Trustee. As part of his effort to reduce the Local's liabilities, Huber issued a "Resolution Concerning Severance Pay" in April 1984, which stated as follows, in pertinent part:

NOW THEREFORE, it is hereby resolved as follows, effective as of the execution of this resolution:

1. The practice by UFCW Local 23 and any predecessor Local Union of paying severance pursuant to any previous action is terminated.

2. In the event any assets of the Local have been set aside for payment of severance pay, such assets shall revert to the general operating funds of UFCW Local 23.

A. at 167.

Deibler was first employed by Local 590 as a Union Business Agent from 1964 to 1966. After spending two years working elsewhere, he returned to work for Local 590 in 1968 as a union organizer. He remained in that job until the 1983 merger, at which time he was promoted to Organizing Director for the new Local 23. In July 1984, Huber reduced Deibler's salary. The next month, Deibler's salary was again reduced and he was demoted to the position of Organizing Representative. Finally, by letter dated January 25, 1985, Huber terminated Deibler as an employee of Local 23.

Two days after his termination, Deibler applied for state unemployment insurance. Local 23 argued before the Unemployment Compensation Referee that Deibler had been fired for "willful misconduct" and that therefore he was not eligible for unemployment insurance under Pennsylvania law. See Pa.Stat.Ann. tit. 43, § 802 (1991). The Referee, however, found no willful misconduct, and as a result Deibler was awarded unemployment benefits. This decision was not appealed.

Sometime in the months preceding his termination, but after Huber's resolution ending the severance policy, Deibler requested a commitment from Local 23 that the union would pay his severance benefits upon his retirement. Huber denied this request. Deibler renewed his request for severance upon his termination in January 1985, and again Huber denied it. Finally, Deibler filed this suit in federal district court, alleging he had been improperly denied severance benefits to which he was entitled.[3]

After a bench trial, the district court issued findings of fact and conclusions of law concluding that (1) Local 23's severance pay plan became a funded ERISA plan when the strike fund was converted to a severance pay fund in 1982, and (2) the assets of a funded plan cannot revert to the general operating funds of an employer without violating ERISA. Local 23 filed a motion to amend these findings; subsequently, the district court issued an Order denying this motion and adopting Deibler's Motion in Opposition as the opinion of the court. In this opinion, insofar as is relevant to this appeal, the district court specifically held for the first time that (1) the Local's severance policy constituted a benefit plan within the meaning of ERISA, and (2) the decision of the Unemployment Compensation Referee that Deibler was not ter-

---

2. Paragraph 7(C) of the merger agreement provides as follows:
   (C) Benefit programs, for members maintained by Local 424, 590 and 1407 will be continued by the Merged Organization in accordance with their respective pre-merger rules and regulations.
   A. at 129.

3. Counts I and II of the amended complaint state claims (for severance and vacation pay, respectively) under section 502 of ERISA, 29 U.S.C. § 1132. This section provides that participants in employee benefit plans may bring civil suits in federal district court to recover benefits due under the terms of the plan, or that are required by ERISA itself.

minated for "willful misconduct" estopped Local 23 from arguing that Deibler did not leave Local 23 for a "valid reason" within the meaning of the plan. On the same day, the court entered judgment for Deibler and against Local 23, and awarded $25,492.50 in attorney's fees and $918.38 in costs to Deibler's counsel. In a subsequent order dated July 1, 1991, the district court awarded Deibler $29,400 in severance pay, $2,100 in vacation pay, and $14,300.35 in prejudgment interest.

Local 23 filed a timely notice of appeal.[4]

### III.

■ ERISA recognizes two types of employee benefit plans: "employee pension benefit plans," and "employee welfare benefit plans." 29 U.S.C. § 1002(3) (1988). Severance pay plans are classified under the statute as welfare benefit plans. 29 U.S.C. §§ 186(c), 1002(1)(B). While welfare plans are less strictly regulated under ERISA than are pension plans, they are nevertheless subject to ERISA's fiduciary standards as well as its reporting and disclosure requirements. *See* 29 U.S.C. §§ 1021, 1101; *see also Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1160 (3d Cir.1990). Local 23 argues as a preliminary matter that ERISA does not govern this case because its severance policy was not even a "plan" within the meaning of that statute.[5]

ERISA applies to "any employee benefit plan if it is established or maintained ... by any employer engaged in commerce ..." 29 U.S.C. § 1003(a) (1988). ERISA itself does not provide a definition of the word "plan". The term is clearly not intended as a requirement of a writing. *See Frank v. Colt Indus., Inc.*, 910 F.2d 90, 97 (3d Cir.1990) (courts will enforce unwritten plans under ERISA so as not to frustrate legitimate expectations of employees);

*Donovan v. Dillingham*, 688 F.2d 1367, 1372 (11th Cir.1982) (while ERISA's fiduciary provisions require the plan to be established pursuant to a written instrument, this is only a responsibility of the administrator and not a prerequisite to ERISA coverage). Rather, "[t]he crucial factor in determining whether a 'plan' has been established is whether [the employer has expressed an intention] to provide benefits on a regular and long-term basis." *Wickman v. Northwestern National Ins. Co.*, 908 F.2d 1077, 1083 (1st Cir.1990). In *Donovan*, the Eleventh Circuit formulated the prevailing standard for determining whether a "plan" within the meaning of ERISA has been established:

> In summary, a "plan, fund or program" under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits.

688 F.2d at 1373. This test has since been adopted by other circuits. *See Wickman*, 908 F.2d at 1082; *Brown v. Ampco–Pittsburgh Corp.*, 876 F.2d 546, 551 (6th Cir. 1989); *Scott v. Gulf Oil*, 754 F.2d 1499, 1504 (9th Cir.1985); *see also Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12, 107 S.Ct. 2211, 2218, 96 L.Ed.2d 1 (1987) (no "plan" created where employer assumes no responsibility to pay benefits on a regular basis, such that there is no need for financial coordination and control); *Frank*, 910 F.2d at 97–98 (citing, but not explicitly adopting, *Donovan* test).

■ Whether a plan exists within the meaning of ERISA is "a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person." *Wickman*, 908 F.2d at 1082. We will therefore

---

**4.** Although defendant stated in its notice of appeal that it would appeal the district court's judgment in its entirety, in its appellate briefing defendant does not take issue with the award of $2,100 in vacation pay. Nor did the district court, in either of its opinions, discuss the issue of vacation pay. We therefore decline to reach this issue on this appeal.

**5.** As we explore this issue, we will keep in mind the intent of Congress "that coverage under [ERISA] be construed liberally to provide the maximum degree of protection to working men and women covered by private retirement programs." S.Rep. No. 93–127 (1973), *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4854.

reverse the finding of the district court that there was such a plan *only* if it is clearly erroneous. *See Levendos v. Stern Entertainment, Inc.*, 909 F.2d 747, 749 (3d Cir.1990).

■ The minutes of the 1968 meeting in which Local 590 adopted the severance policy reflect an intent to establish a regular and ongoing severance plan for retiring union officers.[6] Both the original policy, and the policy as amended after the merger, clearly set out the method by which the amount of severance was to be calculated. It is true that the source of financing and the procedure for receiving benefits were never made explicit, but it is enough if these can be ascertained from the "surrounding circumstances". *Donovan*, 688 F.2d at 1373. A reasonable person could easily conclude that each claim for severance pay was to be submitted to the Union's President (or to the deputy trustee after his appointment by the International Union). *See* Testimony of Harold Deibler, A. at 265 ("the customary procedure would be to notify the President of your intent to leave, ... then he would [ask the bookkeeper] to make out a check"). It was also clear that these benefits would be paid by the union, either out of its general assets or from a separate fund set aside for this purpose. Nothing in the record indicates that there was confusion as to any of the relevant factors. Indeed, the predictability of the severance policy is evident from the fact that at least four union officers applied for and received severance between 1982 and termination of the policy in 1984. Taking all this into account, we conclude that the district court was not clearly erroneous in concluding that this was a "plan" within the meaning of ERISA.

**6.** The union argues that the intended beneficiaries cannot be readily ascertained because "the administrator of the policy had complete discretion with respect to recipients of benefits." Brief for Appellant at 35. That is, the policy provided for severance only to those officers leaving the union for a "valid reason", and the interpretation of that phrase was left for the administrator of the policy. But the fact that the policy allows for an exercise of discretion does not disqualify it as a plan within the scope

**IV.**

The Union also argues that the Trustee's "Resolution Concerning Severance Pay" in April 1984 was a valid termination of the severance plan. If this is so, then no severance pay plan existed on the date of Deibler's termination, and he had no right to severance benefits.

■ As we have observed on a number of occasions, ERISA generally allows employers to amend or terminate welfare benefit plans at will so long as the procedure followed is consistent with the plan and the Act. *Hozier*, 908 F.2d at 1160. Welfare plans are not constrained by vesting requirements imposed by ERISA on employee pension plans. *Id.;* 29 U.S.C. §§ 1051–1061, 1081–1086. Moreover, though administrators must administer welfare plans in accordance with ERISA's fiduciary provisions, an employer's decision to amend or terminate a benefit plan is a business decision "unconstrained by the fiduciary duties that ERISA imposes on plan administration." *Id.* at 1162.

■ Of course, a benefit plan may be amended only through a "manifestation of intention ... expressed in a manner which admits of its proof in judicial proceedings." Restatement (Second) of Trusts, § 4, *quoted in Frank*, 910 F.2d at 98. Unlike the internal memoranda at issue in *Frank*, which merely summarized the benefit plan at issue but did not manifest a clear intent to amend it, the resolution of April 1984 expresses an unmistakable intent to amend the union's severance pay policy. Deibler does not contend that he did not understand this resolution, or that he was not apprised of it in a timely fashion. Nor does Deibler challenge the procedure used in adopting the resolution.[7]

of ERISA. *See Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 283 (3d Cir.1988) (plan held to be governed by ERISA even though it provided for early retirement benefits only if employer deemed retirement to be in "its interest").

**7.** Section 402(b)(3) of ERISA, 29 U.S.C. § 1102(b)(3), requires that all benefit plans set forth an amendment procedure. We have observed on prior occasions that, "arguably, ... a plan cannot be amended unless and until an

Instead, Deibler argues, and the district court found, that the union was obliged to pay him severance despite the resolution because the severance plan was *funded.* The first step in this argument is that the severance plan became funded in 1982 when the strike fund was converted to a severance pay fund and placed in an account at Equibank. Although this fund was apparently never used to pay severance, Deibler argues that the fund's purpose can be inferred from the notation on the account's 1983 financial statement, as well as from the deposition testimony of Carl Huber. *See, e.g.,* A. at 49 ("[w]hen they adopted a severance pay practice, ... they took the money that was earmarked for strike benefits and they put it into a separate—I believe it was an Equibank bank account—and earmarked it for severance purposes").

Assuming that the severance policy was indeed funded, Deibler next argues that the assets of a funded welfare plan cannot revert to the employer, but must instead be distributed among plan participants according to the terms of the plan, and that therefore he was entitled to severance benefits upon his termination. Deibler relies upon two separate ERISA provisions in arriving at this conclusion. First, 29 U.S.C. § 1103(d)(2) (1988) provides:

> The assets of a welfare plan which terminates shall be distributed in accordance with the terms of the plan ...

By itself, this provision would not establish Deibler's right to severance, because the April 1984 resolution amended the policy so that all assets would revert to the general operating funds of the union. Plaintiff contends, however, that this resolution is not valid because it violated section 403(c) of ERISA, 29 U.S.C. § 1103(c) (1988):

amendment procedure is added to the plan and complied with." *Frank,* 910 F.2d at 98, *citing Hozier,* 908 F.2d at 1163 n. 9. Nevertheless, we have never faced this issue directly, and we decline to do so here, where the plaintiff has not challenged the procedure by which the Resolution was adopted.

**8.** Section 1344(d) provides in relevant part:

> Except as provided ... under section 1342 and 1344 ..., the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan ...

Deibler interprets this language to mean that the assets of a funded welfare plan can never revert to the employer under any circumstances. This, however, is not the case: The provision explicitly allows for two exceptions to the rule of non-reversion. As we noted in *Chait v. Bernstein,* 835 F.2d 1017, 1023 (3d Cir.1987), one of these two exceptions, § 1344 of 29 U.S.C., allows for reversion to employers of plan surplus.[8] We accordingly held in *Chait* that while the assets of a terminated, funded pension plan must be distributed to participants in accordance with the terms of the plan, any assets remaining after this distribution may indeed revert to the employer if the plan so provides. 835 F.2d at 1023.

Deibler's reading of §§ 1103(c), 1103(d), and 1344, fails to take into account a fundamental and well-established proposition that is an integral part of the statutory scheme those sections embody. Non-vested benefits may be reduced or eliminated at any time. *Hozier,* 908 F.2d at 1160; *Moore v. Metropolitan Life Ins. Co.,* 856 F.2d 488, 491 (2d Cir.1988). As we noted in *Hozier,* Congress deliberately chose to provide this flexibility where non-vested benefits are concerned in order to minimize the costs of benefit plan administration and to encourage employers to create these plans. 908 F.2d at 1160. Because this flexibility was provided by ERISA and because welfare plans, whether funded or unfunded, are expressly exempted from ERISA's vesting requirements, 29 U.S.C. § 1051(1), Deibler would clearly be entitled to no severance pay if the Union had on one day

> (1) ... any residual assets of a single-employer plan may be distributed to the employer if—
> (A) All liabilities of the plan to participants and their beneficiaries have been satisfied,
> (B) The distribution does not contravene any provision of law, and
> (C) The plan provides for such a distribution in these circumstances.
> 29 U.S.C. § 1344(d) (1988).

amended the plan to do away with severance pay and provide for a reversion upon termination, and had then, on the next day, terminated the Plan. In that event, the reversion of the funds to the Union would have been "in accordance with the terms of the plan", 29 U.S.C. § 1103(d)(2), and would have come at a time when all "liabilities of the plan to participants and their beneficiaries [would] have been satisfied", 29 U.S.C. § 1344(d)(1)(A).

In this case, the Union adopted only one resolution, the resolution of April 1984. But the intent of that resolution was indisputably to accomplish the same objectives as the two-step procedure we have just hypothesized. The trustee clearly intended to eliminate severance pay, to provide for a reversion of funds to the Union on termination, and to terminate the plan. Nothing in ERISA is in conflict with Huber's intent or with his attempting to effectuate that intent in a single resolution. Accordingly, we are unpersuaded by Deibler's argument.

In short, ERISA does not distinguish between funded or unfunded plans in any respect material here. The severance pay benefit of anyone who had not left the Union's employ as of the time of the April 1984 resolution was not vested at that time and could be reduced or eliminated by the Union. When the funds in the bank account went back into the Union's general fund, the Plan had no outstanding obligation to participants or their beneficiaries and the transfer was completely consistent with §§ 1103(c), 1103(d), and 1344.[9]

### V.

The judgment of the district court with respect to severance pay will be reversed. The district court's award of attorneys' fees and costs will also be reversed. We will not, however, reverse the district court's award to the plaintiff of $2,100 in back vacation pay. We will remand to the district court with instructions to determine whether, and if so in what amount, there should be an award of prejudgment interest, attorneys' fees, or costs.

---

9. Because we hold that the union's severance policy was lawfully terminated prior to plaintiff's discharge, we need not discuss the district court's conclusion that the Unemployment Compensation Referee's decision was res judicata as to the reason for Deibler's discharge.