**James E. STONE, Plaintiff**

v.

**DISABILITY MANAGEMENT SERVICES, INC. and Equitable Life Assurance Society of the United States of America, Defendants**

No. 3:02CV44.

United States District Court, M.D. Pennsylvania.

Oct. 14, 2003.

Gerard William Langan, Jr., O'Malley and Langan, Pittston, PA, for Plaintiff.

Richard McMonigle, Jr., Tracey N. Kilcullen, Post & Shell, P.C., Philadelphia, PA, for Defendants.

### MEMORANDUM

MUNLEY, District Judge.

Before the court for disposition is the defendants' motion for summary judgment as to whether the plaintiff's claim is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). The matter is ripe for disposition having been fully briefed. For the reasons that follow, we grant the summary judgment motion in part and deny it in part.

## I. Background

James E. Stone ("plaintiff") is part owner and manager of an office furniture business, Stone Office Supply, Inc ("Stone Office"). *See* Plaintiff's Complaint at ¶ 6. In December 1992, plaintiff gained coverage under a disability income policy issued by Defendant The Equitable Life Assurance Society of the United States ("Equitable"). *Id.* at ¶ 4. That policy provides that plaintiff will receive benefits if he is unable to

work, in full or in part, due to sickness or injury. *Id.*

In March 2000, plaintiff was diagnosed with multiple sclerosis. *Id.* at ¶ 8. As a result, plaintiff has cut back on his work by 50%. *Id.* Sometime after plaintiff became ill, he filed a claim with Defendant Equitable. Defendant Disability Management Services ("DMS"), a third party administrator for Equitable, began payment on plaintiff's claim in April 2000. *Id.* at ¶ 10. On April 13, 2001, DMS began payments under a different calculation system, which takes into account his ownership share in the business in calculating his "monthly earnings." *Id.* at ¶ 11, Exhibits B and C. In applying this system, DMS has reduced the monthly payments it makes to plaintiff in proportion to losses that the business has been facing. *Id.* Plaintiff disagrees with the method of benefit calculation and therefore filed the present suit. *Id.* at ¶ 12. The facts are addressed in more detail below, where appropriate.

The plaintiff has filed a diversity complaint against DSM and Equitable (collectively, "defendants"). The complaint contains four counts: Count I for Breach of Contract; Count II for Bad Faith; Count III for Fraud and/or Negligent Misrepresentation; and Count IV for Violation of the Unfair Trade Practices and Consumer Protection Law ("UTP–CPL"). 73 PA. CONS. STAT. ANN. § 201–1 *et seq.* (West 1993).

Defendants filed a motion to dismiss plaintiff's complaint. Following oral argument before this Court, and on the advice of this Court, the parties stipulated to withdraw the motion to dismiss. This Court then issued an order permitting discovery limited to settling the issue of whether ERISA governs the instant dispute or not. Defendants argue that the disability insurance plan at issue is covered by ERISA. Plaintiff counters that the plan does not fall within the scope of ERISA. Defendants filed a motion for partial summary judgment as to whether plaintiff's claim is governed by ERISA, bringing the case to its present posture.

## II. Jurisdiction

The Court exercises jurisdiction over this case pursuant to the diversity statute, 28 U.S.C. § 1332. Because the Court is sitting pursuant to its diversity jurisdiction, the substantive law of Pennsylvania shall apply. *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir.2000) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

## III. Standard of Review

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Knabe v. Boury*, 114 F.3d 407, 410 n. 4 (3d Cir.1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) .(emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. *International Raw Materials, Ltd. v. Stauffer Chem. Co.*, 898 F.2d 946, 949 (3d Cir.1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-

moving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (1986). A fact is material when it might affect the outcome of the suit under the governing law. *Id.* Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

## IV. Discussion

Defendants argue that plaintiff's disability insurance policy is an "employee welfare benefit plan" as defined by ERISA. Because of this, defendants assert, it is subject to the comprehensive regulations of ERISA. Plaintiff denies that his disability insurance policy falls within ERISA. Instead, plaintiff contends it constitutes a personal individual policy.

For plaintiff's insurance policy to fall within ERISA, it must fit within ERISA's definition of an "employee welfare benefit plan," which is:

> any plan, fund, or program which … [is] established or maintained by an employer or by an employee organization … to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment … or (B) any benefit described in section 302(c) of the Labor Management Relations Act, 1947 [29 USC § 186(c) ] (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1)

The above definition can be broken down into five elements that must be satisfied in order to find that an employee welfare benefit plan is within ERISA's scope. There must be

(1) a 'plan, fund, or program'

(2) established or maintained

(3) by an employer

(4) for the purpose of providing health care or disability benefits

(5) to participants or their beneficiaries.

*Sipma v. Mass. Cas. Ins. Co.,* 256 F.3d 1006, 1009 (10th Cir.2001) (citing *Gaylor v. John Hancock Mut. Life Ins. Co.,* 112 F.3d 460, 464 (10th Cir.1997)).

There is no dispute that the last two elements were met in this case. The real dispute is whether this is a plan which the employer "established or maintained." We shall discuss these three factors seriatim.

### A. Plan, Fund or Program

The Court must determine whether an ERISA plan, fund or program was established. " '[A] plan, fund or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Deibler v. United Food & Commercial Workers' Local Union 23,* 973 F.2d 206, 209 (3d Cir.1992). Whether a plan exists within the meaning of ERISA is "a question of fact, to be answered in light of all the surrounding facts and cir-

cumstances from the point of view of a reasonable person." *Id.*

■ The policy at issue qualifies as an ERISA governed employee benefit plan. The test set forth in *Deibler* is helpful in guiding our analysis of this issue. First, it is undisputed that the intended benefits of the Equitable policy are disability benefits. Second, a reasonable person could easily conclude that the class of beneficiaries is the shareholders of Stone Office.[1] Third, the source of financing was Stone Office.[2] Finally, the requirements for receiving benefits are found in the policy provisions. "[A]s to the procedure for receiving benefits, a reasonable person could ascertain that the employees were expected to look to the provisions of the policy ... to determine the eligibility requirements to receive benefits." *See Weinstein v. Paul Revere Ins. Co.*, 15 F.Supp.2d 552, 557 (D.N.J. 1998).

In its Brief in Opposition to Defendants' Motion for Summary Judgment, the plaintiff's sole basis for arguing that the policy in issue is not an ERISA plan is that the evidence "fails to establish that the employer expressed an intention to provide the specific disability benefit to the Plaintiff." *See* Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Opposition Brief"), at 5–7. To support its argument, the plaintiff relies on a statement in *Wickman v. Northwestern Nat'l Ins.*, 908 F.2d 1077

(1st Cir.1990), that "the crucial factor in determining if a 'plan' has been established is whether the purchase of the insurance policy constituted an expressed intention by the employer to provide benefits on a regular and long term basis." *Id.* at 1083 (also quoted in *Deibler*, 973 F.2d at 209).

Plaintiff cites deposition testimony from himself and Stone Office's insurance agent, Charles Rader, to the extent that the intention was for each individual, and not the company, to pay for their own Equitable policy. *See* Plaintiff's Opposition Brief, at 6–7. This same testimony, however, evidences the company's intention that the Equitable policies were to replace earlier policies, from Guardian Insurance, which had previously been in place for the company officers. *Id.* Plaintiff's testimony demonstrates that the corporation had a long term commitment to ensuring that the corporate officers were covered by disability insurance. His testimony indicates that they were prompted by the business' accountant to take measures to protect the business in the event of the death or sickness of an officer and shareholder. *See* Defendants' Exhibit "I," at 33–34, 59–60.

Moreover, *Wickman* also states that "the purchase of a group policy or multiple policies covering a class of employees offers substantial evidence that a plan, fund, or program has been established." 908 F.2d at 1083 (citing *Donovan*, 688 F.2d at 1373). Citing and applying the *Deibler*

---

1. There were three shareholders of Stone Office and each of them received the same disability policy. *See* Defendants' Exhibit "F", at 24. The fact that the plaintiff was a shareholder of Stone Office does not affect his status as an employee under an ERISA plan. *See Sipma*, 256 F.3d at 1010 ("[T]he corporation, not the shareholder, is the employing party in an employment relationship.").

2. As discussed below, Equitable billed Stone Office each month and Stone Office made the monthly premium payments to Equitable.

*See* Defendants' Exhibit "G," at 35–38. In holding that the test set forth in *Donovan* was satisfied, the court in *Weinstein v. Paul Revere Ins. Co.*, 15 F.Supp.2d 552 (D.N.J.1998) similarly found that "[the employer], who agreed to pay the premiums, was the source of funding for the policy... In fact, the bills for the premiums were sent directly to [the employer]." *Id.* at 557. Moreover, in the instant case, the plaintiff did not have a fixed repayment schedule and the balance owed to the company carried over from year to year.

factors discussed above, the *Wickman* court held that the test was easily met, in that "the intended benefits were accident insurance benefits," "[t]he beneficiaries were full-time employees and their appointed beneficiaries," and "the employer, financed the plan and possibly also employee contributions." *Id.* at 1082. As in *Wickman,* the evidence in the present case demonstrates that multiple policies were purchased covering a class of employees. We find that the purchase of disability insurance for each shareholder is substantial evidence that an ERISA plan had been established.

Consequently, we conclude that there was a "plan" as required by the definition of "employee welfare benefit plan." 29 U.S.C. § 1002(1).

### B. Established or Maintained by an Employer

■■■ The Court must determine whether Stone Office established or maintained the plan. "To determine whether an employer 'established or maintained' an employee benefit plan, 'the court should [focus] on the employer ... and [its] involvement with the administration of the plan.'" *Hansen v. Cont'l Ins. Co.,* 940 F.2d 971, 978 (5th Cir.1991). "No single act in itself necessarily constitutes the establishment of a plan, fund or program." *Donovan,* 688 F.2d at 1373 (11th Cir.1982). "Thus, if an employer does no more than purchase insurance for her employees, and has no further involvement with the collection of premiums, administration of the policy, or submission of claims, she has not established an ERISA plan." *Id.*

In *Weinstein,* 15 F.Supp.2d at 558, the court considered whether the employer had established or maintained an ERISA plan. According to the court, the fact that the employer purchased multiple disability insurance policies for the plaintiff and other professional employees was substantial evidence that an ERISA plan had been established. *Id.* The court found that the employer assumed at least some responsibility for the administration of the program by providing an insurance broker to assist employees with the application process for the individual disability policies. *Id.* The court also found that the insurance broker acted as a sort of intermediary between the employees and the disability carrier. *Id.* The court concluded that the company, "by providing the insurance broker, assumed a role in the ongoing administration of the policy." *Id.See also Kuehl v. Provident Life and Accident Ins. Co.,* No. 97–1021, 2000 U.S. Dist. LEXIS 21625 (E.D.Wis.2000) (Despite the fact that individual disability policies were not listed as employee benefits by the employer, where the company provided for disability policies for certain employees, and the employees secured discounted premiums through statement billing, individual policies were part of ERISA plan as company intended to provide employees with benefits.)

The evidence in the present case establishes that Stone Office supplied multiple individual disability policies to its shareholders. Stone Office's insurance agent, Charles Rader ("Rader"), assisted the shareholders, including the plaintiff, with their applications. Rader also assisted the policy holders at Stone Office, particularly the plaintiff, with some of their disability policy and coverage questions, acting, more or less, as an intermediary.

According to Rader's testimony, he came to Stone Office to review the insurance they had in place and to make recommendations. *See* Defendants' Exhibit "F", at 18–21. Rader testified that he worked on the insurance offered to the shareholders first and then worked on the group insurance plans available to the other company employees. *See id.* at 24–25. In

reviewing the disability insurance, he provided the shareholders with individual policies that had a 10 % premium discount. *Id.* at 24. The discount was available solely because the three shareholders qualified as executives working for the same employer. *Id.*

Additionally, Rader testified that he completed the application for the Equitable policies for the shareholders, including the plaintiff, by meeting with them to collect the relevant information. *Id.* at 34–35. Rader also testified that the plaintiff and others at Stone Office would approach him with questions regarding their disability policies. *Id.* at 56–57. In particular, Rader testified that he recalled the plaintiff contacting him when he filed his disability claim. *Id.* at 57–58. Finally, Stone Office received the statement bill and then remitted payment for the shareholders' policies each month.

In sum, we find that Stone Office established or maintained an employee welfare benefit plan within the meaning of ERISA.

## C. Safe Harbor Regulations

The Department of Labor has issued "safe harbor" regulations that exempt certain policies from the definition of an employee welfare benefit plan under ERISA. A plan is not an employee welfare benefit plan when:

(1) No contributions are made by an employer or employee organization;

(2) Participation [in] the program is completely voluntary for employees or members; ·

(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deduction or dues checkoffs.

*See* 29 C.F.R. § 2510.3–1(j).

"All four factors must be met for a plan to fall within the regulation's safe harbor." *Weinstein,* 15 F.Supp.2d at 557. The parties agree that the safe harbor regulation is relevant, participation in the program was voluntary (provision 2), and that Stone Office did not receive consideration for the provision of the disability insurance to the shareholders (provision 4). The provisions that are in dispute are: (1) whether a "contribution" was made by Stone Office; and (3) whether Stone Office "endorsed" the policy.

### 1. Employer Contribution

█ Although the Court of Appeals for the Third Circuit has not decided the meaning of "no contributions are made by an employer," district courts in the Circuit have addressed the issue. In a well-reasoned opinion, Judge Stephen Orlofsky held that "contribution" should be given its clear meaning. *Morris v. The Paul Revere Insurance Group,* 986 F.Supp. 872, 880 (D.N.J.1997). If an employer pays for a premium, then it has contributed. *Id.* ("[P]ayments by the employer are inconsistent with the unambiguous language of the regulation.") To determine whether an employer has paid, the court considered the behavior of the parties at the time of the payment, not later, self-serving allegations. *Id.* at 880–81.

█ "Where an employer provides its employees benefits that they cannot receive as individuals, it has contributed to an ERISA plan." *Brown v. The Paul*

*Revere Life Ins. Co.*, No. CIV.A.01–1931, 2002 WL 1019021, at *7 (E.D.Pa. May 20, 2002). In *Brown*, a 15% discount was only available to the plaintiff because he purchased the insurance together with other employees. *Id.* at *7. There, the court concluded that the safe harbor's first provision was not satisfied "because [the employer] made a 'contribution' to the Policy by providing Brown a benefit he could not have received as a non-employee." *Id.* See, also, *Kuehl*, 2000 U.S. Dist. LEXIS 21625, at *10 (contribution exists where 10% discount available only to employees in group plans).

In the present case, Charles Rader, the insurance agent for Stone Office, testified that the plaintiff and other shareholders of Stone Office received a 10% discount on their disability policy premiums, and that the discount was only available because three Stone Office employees were grouped together on one statement bill. *See* Defendants' Exhibit "F" at 39. They had to "have it billed through the employer." *Id.* Plaintiff also testified that he knew that the application and billing forms were set up so that he and his fellow shareholders would receive a 10% discount. *See* Defendants' Exhibit "I" at 75–76. Plaintiff testified that, "Certainly, in 1992 and today, if someone offers me a 10 percent discount on something, when it's a matter of, you know, it has to go to this address, I'm all for it. I'll take the 10 percent discount." *Id.* at 78.

Moreover, Ron Gribble, controller for Stone Office, testified that Stone Office paid the monthly premiums on each shareholders disability policy. *See* Defendants' Exhibit "G," at 35–39. The shareholders were free to pay back that money at their leisure. *Id.* at 43, 45. The corporation carried that outstanding balance year to year. *Id.* The employer's interest and term free monthly loans to its shareholders clearly amounts to a contribution to the plan.

The safe harbor's first exclusionary factor does not apply because Stone Office made a "contribution" to the disability insurance by providing the plaintiff a benefit he could not have received as a non-employee. Accordingly, we hold that the disability insurance plan does not fall within the scope of the "safe harbor" regulations issued by The Department of Labor.

**2. Employer Endorsement**

Because the "no contribution" requirement is not met, it is unnecessary to determine whether Stone Office endorsed the policy.

**D. ERISA Savings Clause**

When Congress enacted ERISA, it included an express provision that preempts state law claims "relating to any employee benefit plan." 29 U.S.C. § 1144(a). However, Congress was also concerned with the prospect of limiting states' authority to regulate insurance. Thus, it provided for a savings clause that exempts state laws that "regulate insurance" from ERISA preemption. 29 U.S.C. § 1144(a). Having found that the policy at issue qualifies as an ERISA governed employee benefit plan, the parties do not dispute that Count I for Breach of Contract; Count III for Fraud and/or Negligent Misrepresentation; and Count IV for Violation of the UTP–CPL are pre-empted by ERISA's express pre-emption clause.

However, the parties do dispute whether ERISA pre-empts plaintiff's Count II for Bad Faith, pursuant to 42 Pa. Cons.Stat. Ann. § 8371 ("Section 8371"). In order to determine whether Section 8371 regulates insurance within the meaning of ERISA's saving clause, the Court must conduct a two-part test pursuant to *Kentucky Ass'n of Health Plans, Inc. v.*

*Miller,* 538 U.S. 329, 123 S.Ct. 1471, 155 L.Ed.2d 468 (2003) ("the *Miller* test") with Section 8371 satisfying both prongs in order to be saved from preemption. First, "the state law must be specifically directed toward entities engaged in insurance." *Id.* at 1479 (citing *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *UNUM Life Ins. Co. v. Ward,* 526 U.S. 358, 368, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999); *Rush v. Moran,* 536 U.S. 355, 366, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002)). Second, "the state law must substantially affect the risk pooling arrangement between the insurer and the insured." *Id.*

The *Miller* test has "dramatically changed the analysis for determining whether state legislation qualifies for exemption from express preemption under ERISA via ERISA's savings clause." *Rosenbaum v. Unum Life Ins. Co.,* No. 01–6748, 2003 U.S. Dist. LEXIS 15652, at *2. *See,* also, *Elliot v. Fortis Benefits Ins. Co.,* 337 F.3d 1138, 1145 (9th Cir.2003) (noting that under the *Miller* test, state laws might be found to regulate insurance "under a much wider variety of statutes" than earlier Supreme Court caselaw suggested).

▮ Section 8371 provides that "[i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions":

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa. Cons.Stat. Ann. § 8371. Section 8371 is clearly directed toward the insurance industry since the statute is limited to those actions "arising under an insurance policy" and the awards are assessed against "the insurer." Thus, we conclude that the first prong of the *Miller* test is satisfied.

Next, we consider the second prong of the *Miller* test to determine if Section 8371 "substantially affects the risk pooling arrangement between the insurer and the insured." *Miller,* —— U.S. at ——, 123 S.Ct. at 1479. In doing so, we are aware that several District Courts have evaluated Section 8371 in light of the *Miller* test and concluded that it does not substantially affect the risk pooling arrangement. *Diego Morales–Ceballos v. First Unum Life Ins. Co. of Am.,* No. 03–925, 2003 WL 22097493, at *2 (E.D.Pa. May 27, 2003)("Pennsylvania's bad faith statute does not substantially affect the risk pooling arrangement . . . ."); *McGuigan v. Reliance Standard Life Ins. Co.,* 256 F.Supp.2d 345, 348 (E.D.Pa.2003)("Section 8731 does not satisfy the second prong of the *Miller* test. . . ."); *Nguyen v. Healthguard of Lancaster, Inc.,* 2003 U.S. Dist. LEXIS 15627, No. 03–3206, at *24 ("The remedy of punitive damages for bad faith bears no relation to the risk insured against. . . ."); *Leuthner v. Blue Cross and Blue Shield of Northeastern Penn.,* 270 F.Supp.2d 584, 593 (M.D.Pa.2003) ("Section 8371 does not substantially affect the risk pooling arrangement between the insurer and the insured."). We, however, respectfully disagree with these decisions. As discussed below, we find that more persuasive reasoning is put forth by Judge Clarence C. Newcomer in *Rosenbaum.* Consequently, we hold that Section 8731 substantially affects the risk pooling arrangement.

In *Rosenbaum,* Judge Newcomer points out that it is critically important to note the difference between the second prong of the *Miller* test and "the first of the now defunct McCarran–Ferguson factors which

asks 'whether the [law] has the effect of transferring or spreading a policyholder's risk." *Rosenbaum*, 2003 U.S. Dist. LEXIS 15652, at *13. Justice Scalia also noted in the *Miller* decision that the new test is a "clean break from the McCarran–Ferguson factors." *Miller*, 123 S.Ct. at 1479. He carefully distinguished the two tests by explaining that "[the *Miller*] test requires only that the state law substantially *affect* the risk pooling arrangement between the insurer and insured; it does not require that the state law actually spread risk." *Id.*, at 1478 n. 3 (italics in original).

Judge Newcomer reviewed the *Diego Morales–Ceballos* and *McGuigan* decisions cited above and concluded that "[w]hile both of these correctly recite the second prong of the *Miller* test, neither actually applies the standard as presented by *Miller*. Rather, both revert to the very different standard provided in the first of the McCarran–Ferguson factors." *Rosenbaum*, 2003 U.S. Dist. LEXIS 15652, at *15. Similarly, *Leuthner* relies primarily on *Pilot Life* to support its holding, a case where the Supreme Court applied the McCarran–Ferguson factors. *Leuthner*, at 593. In *Nguyen*, on the other hand, the Court analogized Section 8731 to the minimum pay for janitors example in *Miller*. *Nguyen*, 2003 U.S. Dist. LEXIS 15627, at *24. The *Nguyen* Court explained that:

> ... like the minimum pay for janitors example, [Section 8731] does not affect the kinds of bargains that insurers and insureds make. It merely says that, whatever the bargain struck, if it is breached in bad faith by the insurer, the insured may recover punitive damages. The remedy of punitive damages for bad faith bears no relation to the risk insured against, just as requiring some minimum pay for janitors bears no relation to the risk insured against, even though both may raise the premiums insureds must pay for their coverage. Neither law affects the risk-pooling arrangement between an insurer and its insureds.

*Id.*

We are not persuaded by this analysis in *Nguyen*. The minimum pay for janitors example and Section 8731 are not analogous for the purposes of the *Miller* test. "A state law requiring all insurance companies to pay their janitors twice the minimum wage ... does not significantly affect the risk pooling arrangement undertaken by insurer and insured." *Miller*, –––– U.S. at ––––, 123 S.Ct. at 1477. Section 8371, on the other hand, clearly affects the allocation of risk between an insurer and an insured. Section 8371 provides for the possibility of punitive damages. The insured, therefore, faces a greater possible reward if he or she prevails in a bad faith claim, which increases the likelihood that such a claim will be filed. Likewise, it increases the likelihood that an insurer will have to defend against such a claim, which necessarily increases the risk faced by an insurer. This increased risk faced by an insurer significantly affects the risk pooling arrangement between an insurer and an insured.

Moreover, Section 8371 affects the risk pooling arrangement in other ways. For example, the insured's risk that the insurer will deny a claim in bad faith is reduced. *Rosenbaum*, 2003 U.S. Dist. LEXIS 15652, at *17. The possibility of punitive damages alters the risk pooling arrangement as insurers are dissuaded from denying claims in bad faith. *Id.* Section 8371 also limits the ability of insurers to deflect risk in insurance policies. *Id.* at *18. Section 8371 effectively nullifies risk deflection provisions, which have been used by insurers in policies to set limitations on claims and damages. *Id.* Thus, Section 8371 also has the affect of altering provisions in insurance policies. *Id.*

Accordingly, we find that Section 8731 satisfies both prongs of the *Miller* test and thus qualifies for exemption via ERISA's savings clause.

## E. Conflict Preemption

■ Defendants have argued that Section 8371's provisions for punitive damages run afoul of the congressional intent that the civil enforcement provisions of ERISA be the exclusive remedies available in actions asserting improper processing of a claim for benefits. Defendants rely on *McGuigan*, where the Court held that, "even if Section 8371 did satisfy both prongs of the Miller test so as to fall within the savings clause of ERISA by regulating insurance, the Pennsylvania bad faith statute would still be pre-empted by ERISA since the statute provides a form of relief that adds to those available remedies already provided by ERISA." *McGuigan*, 256 F.Supp.2d, at 349–50.

We are not persuaded by the holding in *McGuigan*. The *McGuigan* court relied upon dicta in *Pilot Life* and *Rush*, which is not binding on this Court's evaluation of the instant motion. Once again, we find that more persuasive reasoning is put forth by Judge Clarence C. Newcomer in *Rosenbaum*. In drafting ERISA, Congress created a savings clause that exempts "any law of any State which regulates insurance" from ERISA's preemptive effect. ERISA § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A). Apart from the requirement that the law needs to regulate insurance, Congress did not place any other requisites on the state laws that the clause saves from preemption. In this way, Congress' intent was unambiguous: "it wanted all state laws which regulate insurance to be exempt from preemption under ERISA." *Rosenbaum*, 2003 U.S. Dist. LEXIS 15652, at *23.

Moreover, the *Pilot Life* holding is distinguishable from the present case. In *Pilot Life*, the Supreme Court considered whether ERISA preempted "state common law tort and contract actions." *Pilot Life*, 481 U.S. at 43, 107 S.Ct. 1549. As the plaintiff in the present case points out,

the distinction between common law bad faith analysis and statutory bad faith analysis is critical. Under common law analysis, it is very doubtful that the risk spreading analysis was considered as the law developed. However, in specifically enacting a bad faith statute, the legislature clearly considered the risk spreading as well as economic and financial consequences of such an Act on both insurers and insureds.

Plaintiff's Reply Memorandum Regarding *Kentucky v. Miller*, at 3.

The 10th Amendment provides that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. CONST. art. X. This Court finds that the common law (as examined in *Pilot Life*) does not implicate the 10th Amendment in the same way as the explicit statutory authorization in the present case. The fundamental purpose behind ERISA's savings clause is to respect state sovereignty in insurance regulation. Here, where the Pennsylvania legislature has enacted special protection for its citizens against abusive insurance companies, only a "clear and manifest" Congressional purpose could supersede this protection. *See Hillsborough County v. Automated Med. Lab., Inc.*, 471 U.S. 707, 715, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) ("[T]he historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.") We do not find any such language contained in ERISA. Rather, we find that the "any law of any State" language in the savings clause clearly indicates Congress' purpose

to respect state sovereignty. Consequently, we hold that Section 8731's provision of punitive damages is consistent with Congress' intent in drafting ERISA.[3]

In sum, we find that the Section 8731 satisfies the Miller test and is not subject to conflict preemption under ERISA.

## V. Conclusion

For the above state reasons, we will grant defendants' summary judgment motion with respect to whether plaintiff's claim is governed by ERISA. We will deny the motion with respect to whether plaintiff's claim under 42 PA.C.S.A. § 8371 is preempted by ERISA. An appropriate order follows.

## *ORDER*

**AND NOW**, to wit, this _____ 14th _____ day of October 2003, defendants' motion for summary judgment (Doc. 22) is **GRANTED** with respect to whether the plaintiff's claim is governed by ERISA. It is **DENIED** with respect to the preemption of plaintiff's claim under 42 PA.C.S.A. § 8371.

---

**3.** In making this determination, we acknowledge that this Court had previously determined that Section 8371 was subject to conflict preemption. However, in light of *Miller* and the persuasive reasoning put forth by Judge Newcomer in *Rosenbaum*, we exercise our judicial discretion to reconsider the issue.