**Edna G. ACUNA, M.D., Plaintiff,**

v.

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY, and Metropolitan Life Insurance Company, Defendants.**

**Civil Action No. 5–05–cv–22 (DF).**

United States District Court,
E.D. Texas,
Texarkana Division.

March 6, 2008.

714

A. Paul Miller, Miller James Miller & Hornsby, Texarkana, TX, for Plaintiff.

Andrew Chesnut Whitaker, Figari & Davenport, Dallas, TX, for Defendants.

## ORDER

DAVID FOLSOM, District Judge.

Currently before the Court are Defendants' Written Submission Regarding the Applicability of ERISA (Dkt. No. 62), Plaintiff's Written Submission (Dkt. No. 65), and Defendants' Reply (Dkt. No. 66). The parties have advised the Court that the applicability of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, in this case may be resolved by these submissions. Dkt. No. 60 at 1. Having read the submissions and considered the arguments, the Court finds that ERISA is **APPLICABLE.**

## I. BACKGROUND

### A. FACTUAL HISTORY

Connecticut General Life Insurance Company ("Connecticut General") issued Plaintiff, Dr. Edna G. Acuna ("Plaintiff"), a first disability income protection policy ("First Policy") on May 1, 1988 and a second disability income protection policy ("Second Policy") on October 1, 1988. Dkt. No. 43 at 1. Around December 1999, Metropolitan Life Insurance Company ("MetLife") became the reinsurer and claims administrator of certain policies issued by Lincoln Nation Life Insurance Company, which had previously become the reinsurer and claims administrator of certain Connecticut General policies. *Id.*

Plaintiff alleged that she became unable to perform her duties as an anesthesiologist due to complex ocular disease including frequent, repeated attacks of glaucomatocyclitic crisis. Dkt. No. 34 at 2. Plaintiff brought an action against Connecticut General and MetLife (collectively "Defendants") to recover benefits under two disability income protection policies issued by Connecticut General and administered by MetLife. Dkt. No. 1 at 1. This

matter was originally filed in the District Court of Titus County, Texas but was removed to this Court by Defendants on February 3, 2005. *Id.*

## B. PROCEDURAL HISTORY

Defendants filed a Motion for Summary Judgment Regarding ERISA Preemption on March 25, 2005. Dkt. No. 16. Defendants argued that the policies are part of an Employee Welfare Benefit Plan ("Plan"), as defined in 29 U.S.C. § 1002(1), governed by ERISA. Dkt. No. 16 at 4. Defendants also stated that the plan did not fall within the Safe Harbor. *Id.* at 8. Defendants also urged that the Court's review was limited to the administrative record. *Id.* at 11.

Plaintiff responded and filed a counter motion for summary judgment that ERISA was inapplicable to this case. Dkt. No. 20 at 1. Plaintiff counters that there was no plan and also that the case fell under the safe harbor provision pursuant to 29 C.F.R. 2510.3–1(j) which provides a clear exclusion met by the Plaintiff. *Id.* at 11.

After the motions were adequately briefed, Magistrate Judge Craven issued a report and recommendation denying Defendants' motion and granting Plaintiff's motion. Dkt. No. 34 at 1. Judge Craven determined that "the supposed 'plan' lacked an administrative scheme and did not qualify as a 'plan' or an ERISA plan." *Id.* at 20. Judge Craven then determined whether, assuming the policies constituted an ERISA plan, the plan fell within the Department of Labor's Safe Harbor Exclusion. *Id.* The Department of Labor provided a safe harbor for programs under which four elements are met. *Id.* Judge Craven determined that the second and fourth elements were not at issue. *Id.* Judge Craven then addressed the first element, determining whether contributions were made by the employer, and the third element, determining whether the employer endorsed the program. *Id.* at 20–24. Judge Craven concluded that Plaintiff established both the first and third element of the safe harbor. *Id.* at 25. Judge Craven then recommended that the cause of action be remanded to the state court. *Id.* at 26.

Defendants filed objections to Judge Craven's Report and Recommendations arguing that its evidence was not given any weight and that Judge Craven erred in recommended that the case be remanded. Dkt. No. 35 at 2. This Court reviewed Judge Craven's recommendation *de novo* and in an Order issued on January 3, 2006 ("Prior Order"), made a determination that genuine issues of material fact existed as to whether ERISA is invoked in this matter. Dkt. No. 39 at 2. The Court also determined that it had diversity jurisdiction and this matter would not be remanded. *Id.* at 2–3. The Court then denied both Plaintiff's and Defendants' motions for summary judgment. *Id.* at 11.

Defendants filed a motion for hearing on the applicability of ERISA. Dkt. No. 40. Plaintiffs objected to this motion, but the Court determined that it would resolve the applicability of ERISA in this case. Dkt. No. 60 at 1.

The Court considers the arguments in the written submissions as well as those in the motions for summary judgment. Defendants cite to much of the evidence provided in the summary judgment briefs and Plaintiff explicitly adopted its reasoning in its prior motions. Dkt. No. 65 at 2–3.

## II. EVIDENCE SUBMITTED

On December 5, 1986, Edna G. Acuna (Plaintiff), Bennett N. Benson, Doreta Almendral, Rex L. Hyer, Josefina A Mactal, and Norberto F. Poquiz, formed a Professional Association called Genesis Anesthesiology Services, P.A. ("Professional Asso-

ciation"). Dkt. No. 62 at 2–3 (citing Dkt. No. 62, Ex. 1 at 3–4); Dkt. No. 65 at 3 (citing Dkt. No. 65, Ex. A–1). At the time of the formation, the Physicians created "Genesis Anesthesiology Services, P.A. Defined Contribution Plan and Trust which was an ERISA-governed defined benefit plan." Dkt. No. 65 at 3 (citing Dkt. No. 65, Ex. B (second affidavit of Tito Acuna)).

According to Plaintiff, Tito Acuna ("Tito") was a "W–2 employee" of Connecticut General and sought to sell disability insurance to the Professional Association and the Defined Contribution Plan and Trust. Dkt. No. 65 at 3 (citing Dkt. No. 65, Ex. B). Defendants allege that while the individuals of the Professional Association were free to apply individually, the "shareholders elected to apply to Connecticut General on a group basis, which entitled them to a 15% multi-life discount that they would not have been able to get if they had obtained the coverage individually without the Professional Association's involvement." Dkt. No. 62 at 5 (citing Dkt. No. 62, Ex. 4 at 25; Dkt. No. 62, Ex. 5 at 17–18). Plaintiff alleges that the policies were purchased by the physicians participating in the Professional Association, the policies were in different amounts, and the individual physicians were responsible for their own premium payments. Dkt. No. 65 at 4. Plaintiff alleges that the Connecticut General employee, Tito, sat down with each doctor and "took their applications individually—they were individually underwritten by Defendant Connecticut General." *Id.* (citing Dkt. No. 65, Ex. C–1 at 4). Plaintiff alleges that all dealings were through "the Connecticut General 'Individual Underwriting Department' and 'Individual Financial Services Division' rather than the group insurance unit." *Id.* (citing Dkt. No. 65, Ex. A–1 (Plaintiff's affidavit); Dkt. No. 65, Ex. B; Dkt. No. 65, Ex. D at 3,4,6,9–14,16–17). Plaintiff alleges they were able to qualify for a 15% discount (a "list bill discount") because at

least three individuals could be billed through the same billing address, the address of the partnership. *Id.* (citing Dkt. No. 65, Ex. A–1, A–2, A–3, A–4, A–5, B).

According to Defendants, the Plaintiff stated on her application that she was employed by the Professional Association and that the "Professional Association would pay 100% of the premiums for her coverage and would not include its payments as taxable income to her." Dkt. No. 62 at 5 (citing Dkt. No. 62, Ex. 2 at 5). Defendants assert that the other shareholders of the Professional Association similarly indicated that the Professional Association would be paying all of the premiums for their policies and not including its payments in their taxable income. Dkt. No. 62 at 6 (citing Dkt. No. 62, Ex. 4 at 16–17). Defendants also indicate that in the accompanying licensed representative questionnaire, Tito indicated that Acuna's coverage was part of an account-billed business and all seven shareholders were joined in applying for disability coverage. *Id.*

After Connecticut General issued the First Policy and issued premium notices, Defendants allege that the "Professional Association's clerical staff received the premium invoices and paid them (through checks on the Professional Associations's account) for the benefit of Acuna and the other shareholders." Dkt. No. 62 at 7 (citing Dkt. No. 62, Ex. 3 at 38 & 49, Ex. 4 at 20, Ex. 5 at 11). The Professional Association also processed any premium refunds and handled the related bookkeeping. *Id.* Plaintiff alleges that the policies were paid out of the income of the individual physicians and were all taxable income. Dkt. No. 65 at 5. Plaintiff further alleges that the Professional Association "did not maintain a benefits or Plan administrator and was not responsible for claim submis-

sion and did not endorse or encourage the disability insurance." *Id.* at 6.

In late 1988, all physicians except Plaintiff cancelled their Connecticut General disability policies. Dkt. No. 65 at 6. Defendants allege that on November 30, 1998, Plaintiff applied for additional coverage and, consistent with the First Policy, she stated that she was employed by the Professional Association and that all premiums would be sent to the Professional Association, which would pay 100% of the premiums and would not be taxable income to her. Dkt. No. 62 at 8 (citing Dkt. No. 62, Ex. 2 at 24). Defendants allege that Tito indicated that the coverage "was to be part of an existing account-billed business case that was to receive (by virtue of the Professional Association's involvement) a 15% premium discount." *Id.* at 8–9 (citing Dkt. No. 62, Ex. 2 at 27). Plaintiff alleges that she corresponded with Connecticut General and negotiated regarding her individual disability policy apart from the "list bill" and Connecticut General removed the "eye rider" and continued the 15% list bill discount in an effort to "salvage the case." Dkt. No. 65 at 6 (citing Dkt. No. 65, Ex. D at 6). Thereafter, Connecticut General issued the Second Policy which provided coverage of $13,300 per month benefit and with the removal of the "eye rider." Dkt. No. 62 at 9; Dkt. No. 65 at 7.

Plaintiff alleges that all interactions with Connecticut General was performed by the "Individual Financial Services Division" and by an "Individual Underwriting." Dkt. No. 65 at 7. Plaintiff further argues that after leaving the Professional Association in the early 1990s, she worked as an unregistered d/b/a Anesthesia Services Associates and paid her premiums under this name and later through her personal checking account. *Id.*

Defendants allege that when Plaintiff sought benefits from MetLife in July 2003, she stated that 100% of the premiums were for her "group disability coverage" and had been paid by her "employer." Dkt. No. 62 at 9.

## III. LEGAL PRINCIPLES

### A. Standard of Review

Defendants argue that the Court must resolve the question regarding the applicability of ERISA. Dkt. No. 62 at 2. Defendants state that the Fifth Circuit has found that jurisdictional issues are for the district court to decide and is not merely limited to undisputed facts, but rather, the district court "may hear conflicting written and oral evidence and decide for itself the factual issues which determine jurisdiction." *Id.* (quoting *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); citing *MDPhysicians & Assocs., Inc. v. State Bd. of Ins.,* 957 F.2d 178, 180–81 (5th Cir.), cert. denied, 506 U.S. 861, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992)).

Defendants argument regarding the Court's ability to make factual determinations is not addressed by Plaintiff in its response to either Defendants' written submission or Defendants' original motion for hearing on the applicability of ERISA. By the fact that both parties agreed that the Court may decide this issue on written submissions, the Court notes that both side agree that the Court may make factual determinations.

■ Whether the policy issued by Defendants is governed by ERISA is a threshold legal issue. *Provident Life & Accident Ins. Co. v. Sharpless,* 253 F.Supp.2d 874, 877 (M.D.La.2003). "The existence of an ERISA plan necessarily depends on the existence of an employer and an employee, and is a question of fact which must be decided by the court." *Id.* (citing *McDonald v. Provident Indemnity*

*Life Ins. Co.*, 60 F.3d 234, 236 (5th Cir. 1995); *Borst v. Chevron Corp.*, 36 F.3d 1308, 1323–24 (5th Cir.1994)). While not so stating, the Fifth Circuit has "followed [their] sister circuits in treating the existence of an ERISA plan as a mixed question of fact and law." *House v. Am. United Life Ins. Co.*, 499 F.3d 443, 449 (5th Cir.2007).

Therefore, the Court determines that it may decide even disputed questions of fact regarding the applicability of ERISA.

## B. Applicability of ERISA

ERISA applies to any "employee benefit plan" if it is established or maintained by any employer or employee organization engaged in commerce, or in any industry or activity affecting commerce. 29 U.S.C. § 1003(a). An "employee benefit plan" or "welfare plan" means:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment. . . .

29 U.S.C. § 1002(1).

The Fifth Circuit articulated its test to determine whether a plan constitute an "employee welfare benefit plan":

> we ask whether a plan: (1) exists; (2) falls within the safe-harbor provision established by the Department of Labor; and (3) satisfies the primary elements of an ERISA "employee benefit plan"—establishment or maintenance by an employer intending to benefit employees. If any part of the inquiry is answered in

the negative, the submission is not an ERISA plan.

*Meredith v. Time Ins. Co.*, 980 F.2d 352, 355 (5th Cir.1993).

## IV. THE *MEREDITH* ANALYSIS

### A. DOES A PLAN EXIST?

#### 1. Legal Principles

In order to determine whether a plan exists, the 5th Circuit has adopted the *Donovan* test from the Eleventh Circuit which states:

> In determining whether a plan, fund, or program (pursuant to a writing or not) is a reality a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits.

*Meredith*, 980 F.2d at 355 (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir.1982)).

The Fifth Circuit has held that an employer's purchase of insurance for its employees is evidence that a plan exists. Prior Order at 7 (citing *Memorial Hospital System v. Northbrook Life Ins. Co.*, 904 F.2d 236, 242 (5th Cir.1990) (citing *Donovan*, 688 F.2d at 1373)). While the *Donovan* test has been cited with approval by the Fifth Circuit, the Fifth Circuit has found "the test inapplicable to the issue of *when* a plan is established, rather than *if* a plan is established." *Memorial Hosp. Sys.*, 904 F.2d 236, 241 n. 4 (5th Cir.1990) (citing *Landry v. Air Line Pilots Ass'n Int'l*, 901 F.2d 404 (5th Cir.1990)) (emphasis in original). In *Landry*, the Fifth Circuit noted that "a plan is normally established *when* all of the requirements for a plan are met." *Landry*, 901 F.2d at 415 n. 32 (emphasis in original); *see also Peterson v. Am. Life & Health Ins. Co.*, 48 F.3d 404 (9th Cir.1995) (finding that a plan de-

rived from an ERISA plan continues to be governed by ERISA even after conversion from a group policy to an individual policy when an employee leaves his employment).

### 2. Parties' Positions

Plaintiff's primary arguments that there was no plan were because (1) the Plaintiff was not an "employee" as defined by ERISA and (2) there was no administrative scheme in the administration of the policy or submission of claims. Dkt. No. 20 at 9; *see Hansen v. Continental Ins. Co.*, 940 F.2d 971, 978 (5th Cir.1991) (stating that "if an employer does no more than purchase insurance for her employees, and has no further involvement with the collection of premiums, administration of the policy, or submission of claims, she has not established an ERISA plan.").

### 3. Discussion

In the Prior Order, the Court determined that the Plaintiff is an employee of the Professional Association for ERISA purposes. Dkt. No. 39 at 7. The Court found *Provident Life & Acc. Ins. Co. v. Sharpless*, 364 F.3d 634 (5th Cir.2004) controlling and held that the "undisputed evidence shows that Plaintiff and other doctors set up the Professional Association as a separate and independent entity with each doctor owning shares." Dkt. No. 39 at 8 (citing Dkt. No. 25, Ex. 1, Articles of Association of the Professional Association). The Court established that "while undisputed evidence establishes that a plan clearly existed, *i.e.*, the benefits and the procedures for obtaining benefits were described in the disability policies, facts issues remain concerning the role the Professional Association played." *Id.* at 10.

Having addressed the first factor, the Court notes that neither party re-addressed this issue in their written submissions. Therefore, the Court proceeds to the safe harbor provisions.

### B. DOES THE SAFE HARBOR APPLY?

#### 1. Legal Principles

The Safe Harbor provision promulgated by the Department of Labor provides that an "employee welfare benefit plan"

shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which

(1) No contributions are made by an employer or employee organization;

(2) Participation [sic] the program is completely voluntary for employees or members;

(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. §§ 2510.3–1(j).

Judge Craven's Report and Recommendation stated that the second and fourth elements were not at issue. Dkt. No. 34 at 20. In the Prior Order, the Court also noted "that the second and fourth element of the safe-harbor provision are not in dispute." Dkt. No. 39 at 8 n. 1. Therefore, the Court allowed further discovery to address the first and third elements.

#### 2. First Element of the Safe Harbor Provision

In the Prior Order, the Court determined that a fact dispute existed as to

whether Plaintiff's employer, the Professional Association, paid either all or part of the premiums for its employees' disability policy or whether the premiums were deducted from Plaintiff's account. Dkt. No. 39 at 8.

### a. Parties' Positions

Plaintiff argues that the payments were paid as a salary deduction coming from pre-tax income. Dkt. No. 65 at 9 (citing Dkt. No. 65, Ex. A–1 at 3). Plaintiffs note that each doctor individually selected the amount of coverage, was responsible for their own premium costs, and they each decided to drop the Connecticut General coverage. *Id.* at 10 (citing Dkt. No. 65, Ex. A–2 at 1 (affidavit of Hyer), Ex. A–3 at 1 (affidavit of Poche), Ex. A–4 at 1 (affidavit of Poquiz); Ex. D at 13 (showing the coverage purchased ranging from $4,600 to $7,600 per month)). Plaintiff emphasizes, through citations to Dr. Poche's deposition statements, that the Professional Association "did not pay all or part of the premiums for the disability income policies." Dkt. No. 65 at 10–11. Plaintiff argues that according to Connecticut General's own agent, "Each individual physician then was responsible for the payment of the premium cost of their individual policy." *Id.* at 11 (citing Dkt. No. 65, Ex. A–5 at 2–3). Plaintiff argues that there was no intent for the Professional Association to provide disability coverage to the doctors, including Plaintiff. *Id.*

Plaintiff also states that Defendants' suggestion that Plaintiff's answer in an application stating that 100% of the premium was paid by the Professional Association is not evidence that the Professional Association actually paid the premiums on behalf of the employees. *Id.* at 12. Plaintiff states that Tito "is clear that no explanatory materials were included with the policy applications so as to explain what construction should be given to questions 10a and 10b," relating to the percentage of

the premium paid by the employer (10a) and the percentage taxable (10b). *Id.* (citing Dkt. No. 65, Ex. C–1 at 8). Plaintiff states that the focus on answering the question was to obtain the "list bill discount" and they were advised by Connecticut General's agent to answer that the Professional Association paid 100% of the premiums "so as to comply with the Connecticut General requirements for list bill." Dkt. No. 65 at 12–13 (citing Dkt. No. 65, Ex. B at 5–6). Plaintiff also state that Tito put 100% since the payments by the individual doctors were made "through" the Professional Association and if there was any mistake in the answers to 10a and 10b that Tito was responsible. *Id.* at 13 (citing Dkt. No. 65, Ex. B at 6).

Plaintiff asserts that the Defendants' state that the Professional Association paid the premiums because a refund check was issued to the Professional Association rather than Plaintiff. Dkt. No. 65 at 13. While the payment notification indicates that the refund was payable to the Professional Association (Dkt. No. 65, Ex. D at 15), the actual premium refund checks issued by Connecticut General were paid directly to Plaintiff (Dkt. No. 65, Ex. D at 18–21). *Id.* at 13–14.

Plaintiff argues that Defendants mischaracterize the amount of coverage provided by Connecticut General based on a guide in effect at the company. Dkt. No. 65 at 19. Plaintiff argues that a Cigna memo explains that they were in a panic regarding Plaintiff's account because a competing insurance company was willing to offer the higher amount of coverage. *Id.* at 20. Plaintiff believes that the higher amount offered was an attempt to "possibly salvage the case." *Id.*

Defendants argue that in Plaintiff's applications for the policies, which she signed and attested to be complete and true to the best of her knowledge, Plaintiff indi-

cated that the Professional Association would pay 100% of the premiums and that they would not be taxable income to her. Dkt. No. 62 at 11 (citing Dkt. No. 62, Ex. 4 at 14). Defendants note that the checks introduced by Plaintiff were "either to or from the Professional Association." *Id.* (citing Dkt. No. 20, Acuna Aff. Ex. A (refiled as Dkt. No. 65, Ex. A–1 at 8)); *id.* at 15. Defendants note that in Plaintiff's claim form submitted in July 2003, Plaintiff characterized the policies as "group disability coverage" and that the employer had paid 100% of the premiums. *Id.* (citing Dkt. No. 62, Ex. 2 at 32).

Defendants also argue that whether the premiums were paid by the Professional Association or the individual was "critical" to the amount of coverage Connecticut General, or any insurer, was willing to issue. Dkt. No. 62 at 11 & 17. Defendants state that "insurers are typically willing to issue more coverage if the premiums are employer paid than if they are employee paid." *Id.* at 11–12 (citing Dkt. No. 62, Ex. 6 at 2). Defendants provide an example that Connecticut General was under the impression that the premiums were paid by the Professional Association because it agreed to issue coverage that was over the amount that its guide warranted. *Id.* at 12 (citing Dkt. No. 62, Ex. 6 at 9 & 13–14). Defendants argue that this increased benefit constitutes an employer "contribution." *Id.* at 17 (citing *Sharpless,* 253 F.Supp.2d at 879; *Reber v. Provident Life & Acc. Ins. Co.,* 93 F.Supp.2d 995, 1000 (S.D.Ind.2000)).

Defendants also note that Plaintiffs have "failed to produce any documents (such as cancelled checks, bank statements, or tax returns) showing that she paid a single dollar of premiums for the Policies, and she admitted that she is not aware of a single document establishing that she reimbursed the Professional Association for its payments on her behalf or paid taxes on that amount." *Id.* at 12–13 (citing Dkt. No. 62, Ex. 4 at 24 & 30–31). Defendants cite to multiple cases where a district court disregarded later, self-serving allegations that established that the employer did not pay the premiums. *Id.* at 13 (citing *Stone v. Disability Mgmt. Servs., Inc.,* 288 F.Supp.2d 684, 691 (M.D.Pa.2003); *Sharpless,* 253 F.Supp.2d at 879; *Thomas v. Great Atlantic & Pacific Tea Co.,* 233 F.3d 326, 331 (5th Cir.2000)).

Repeating the same argument from their original motion for summary judgment (Dkt. No. 16 at 6), Defendants argue that the facts of this case are similar to *Sharpless.* Dkt. No. 62 at 15. Defendants argue that in *Sharpless* the insurer provided a 10% discount and stated on her application that her employer was paying the premiums in the lawsuit she stated that the premiums were paid from their "even-up accounts." *Id.* Defendants argue that the "district court rejected the plaintiff's about-face as 'not credible'." *Id.* (quoting *Sharpless,* 253 F.Supp.2d at 879). Defendants also state that the Fifth Circuit "found ERISA applicable even though it determined that the employer added the premium payments to the plaintiff's W–2 form as salary earned." *Id.* (citing *Sharpless,* 364 F.3d at 637).

Defendants aver that Plaintiff received a 15% premium discount that "would not have been available if the shareholders had handled their coverage individually." Dkt. No. 62 at 16. Defendants cite to multiple cases for the proposition that the "discount constitutes an employer 'contribution' for purposes of the safe harbor." *Id.* at 16 (citing *Stone v. Disability Mgmt. Servs.,* 288 F.Supp.2d 684, 692 (M.D.Pa.2003); *Halprin v. Equitable Life Assur. Soc. of U.S.,* 267 F.Supp.2d 1030, 1037 (D.Colo. 2003); *Brown v. Paul Revere Life Ins. Co.,* 2002 WL 1019021, at *7, 2002 U.S. Dist. LEXIS 8994, at *21 (E.D.Pa. May 20,

2002)). Defendants argue that the deposition testimony indicate that the shareholders of the Professional Association applied as a group in order to obtain the 15% discount. *Id.* (citing Dkt. No. 62, Ex. 2 at 9–15 & 27, Ex. 3 at 25, Ex. 4 at 11, Ex. 5 at 17–18).

### b. Discussion

 Upon reviewing the evidence, the Court finds that the Professional Association paid the premiums. The Court notes that Tito, as Connecticut General's agent explained that he took responsibility for the answers to question 10a and 10b. However, like the *Sharpless* court, the Court does not find Plaintiff's testimony that the money actually came from her account to be credible. The Court notes that Tito is Plaintiff's brother-in-law, and notwithstanding the potential bias, it is contradictory for Plaintiff to argue that there were no "explanatory materials" regarding the construction of questions 10a and 10b while also stating that Tito filled out the premiums and was responsible for making the mistake. Plaintiff was ultimately responsible because she signed and attested to the validity of the application. Also, as Connecticut General's agent, Tito must frequently handle these types of transactions and it is not believable for him to claim that he made a mistake in this single instance where his sister-in-law would happen to benefit. In addition, Plaintiff has been unable to produce any documents, such as bank statements, tax returns, etc. to establish that she paid the premiums for the policies. Dkt. No. 62, Ex. 4 at 24 730–31. The Court is also convinced that the evidence provided indicates that Defendants issued more coverage because the premiums were believed to be paid by the Professional Association. *See* Dkt. No. 62, Ex. 6 at 13. *See Sharpless,* 253 F.Supp.2d at 879.

The Court is not convinced that Plaintiff paid the premiums merely because a re-fund check was issued in her name. The Court also determines that the Professional Association received a discount as a list bill discount; nevertheless, this does not diminish the fact that the Professional Association paid its employees' premiums. Dkt. No. 65, Ex. B at 4

Thus, the preponderance of the credible evidence establishes that the Professional Association paid either all or part of the premiums for Plaintiff. Therefore, because the first element fails, the plan was not exempt from ERISA under the safe-harbor provisions.

### 3. Third Element of the Safe Harbor Provision

In the Prior Order, the Court determined that a fact dispute existed as to whether the Professional Association's role was limited to collecting premiums and sending them to the insurer. Dkt. No. 39 at 8. In the Prior Order, the Court determined that the disputed fact issue was between Defendants' evidence that the Professional Association contacted Connecticut General on behalf of individual doctors and Plaintiff's evidence that Connecticut General's agent setup the program tending to show the program was established by the insurance company.

### a. Parties' Positions

Defendants argue that the third element of the safe harbor provision is not met because the Professional Association bore some or all of the premium costs and administered the plan by performing the bookkeeping. Dkt. No. 62 at 14 (citing *Sharpless,* 364 F.3d at 637). Defendants state that the Professional Association paid all the premiums and Plaintiff has not "introduced a single contemporaneous document (such as a cancelled check, bank statement, or tax return) showing that she personally paid any of the premiums for the Policies." *Id.* at 15. Defendants state that Professional Association's role was not

limited to collecting and remitting premiums, rather the Professional Association:

elected to make disability coverage available to all of its shareholders, enabled them to apply for coverage on a group basis, assisted in the negotiations for the coverage, agreed to receive and process the premium invoices, prepared the checks for those premiums, ensured that its checks were remitted on time, received and processed premium-refund checks, handled the bookkeeping for all of those transactions, obtained a 15% discount by virtue of its involvement, and may well have been responsible for paying all of the premiums itself, which is sufficient employer involvement for purposes of ERISA.

*Id.* at 17–18 (citing *McNeil v. Time Ins. Co.*, 205 F.3d 179, 182 (5th Cir.2000)).

Defendants assert that Tito communicated with Connecticut General on behalf of the shareholders as a group. Dkt. No. 62 at 18 (citing Dkt. No. 62, Ex. 2 at 10–15). Defendants aver that Plaintiff and her co-shareholders could have obtained coverage on their own, but they would have had to be responsible for obtaining coverage, paying the premiums, handling the bookkeeping and they would not have received a 15% discount or a higher coverage. *Id.* at 19.

Plaintiff responds that "[f]or employer endorsement to exist as described in the third element, the courts have stated that *substantial* employer involvement in the creation or administration of a plan must be shown[,] *Thompson v. American Home Assurance Co.*, 95 F.3d 429, 46 [436 (6th Cir.1996) ], not merely facilitating its availability. *Johnson* [*v. Watts Regulator Co.*, 63 F.3d 1129] at p. 1135 [ (1st Cir.1995) ]." Dkt. No. 65 at 15. The Plaintiff argues that the Sixth Circuit in *Thompson* disagreed with the Fifth Circuit in *Hansen* and cited the First Circuit in *Johnson* "for the proposition that acceptance of payroll

deductions, accounting for them, forwarding them on to the insurer, and performing a variety of ministerial tasks that assist the insurer and the insured does not bring ERISA into the picture." *Id.* at 16.

Plaintiff argues that her facts fall within the third element of the safe harbor provision because the affidavits provide that the policies were not administered by the Professional Association and was "limited to the payment of premiums through, in effect, salary deduction of the individual physicians.... [The Professional Association] did not endorse or encourage the disability insurance. No plan documents existed as would exist in an ERISA-governed employee benefit plan." *Id.* (citing Dkt. No. 65, Exs. A–1, A–2, A–3, A–4). Plaintiff argues that the Professional Association did nothing more than write the check. *Id.* at 17 (citing Dkt. No. 65, Ex. C–2 at 42–43).

Defendants reply that the Professional Association contributed to the plan by paying the premiums, allowing the Plaintiff to receive a higher coverage, and providing a 15% discount. Dkt. No. 66 at 8. Defendants argue that Plaintiff was able to obtain a higher coverage and "[m]erely because Connecticut General was willing, as a customer service measure, to match its competitor's offer of $13,300 per month in coverage does not mean that Connecticut General would have issued that amount if it believed the premiums were to be employee paid." *Id.* at 9. Defendants note that Plaintiff did not address its Fifth Circuit authority "establishing that ERISA can apply even though the insurer is responsible for determining whether and to what extent benefits are payable." *Id.* at 10 (citing Dkt. No. 62 at 20 (citing *Memorial Hosp. Sys.*, 904 F.2d at 243)). Defendants note that Plaintiff relies on a First Circuit and a Sixth Circuit opinion while Fifth Circuit precedent "repeatedly found

a lower level of employer involvement than that of the Professional Association to render the third safe-harbor element inapplicable." *Id.* at 11 (citing *McNeil v. Time Ins. Co.,* 977 F.Supp. 424, 427 (N.D.Tex. 1997); *Hansen,* 940 F.2d at 977; *Kidder v. H & B Marine, Inc.,* 932 F.2d 347, 353 (5th Cir.1991); *Memorial Hosp. Sys.,* 904 F.2d at 242–43).

### b. Discussion

The Court finds that the evidence weighs in favor of finding that the third element of the safe harbor provision is not satisfied. The Plaintiff cites to the Sixth Circuit decision in *Thompson* which disagreed with the minimal requirements of the Fifth Circuit's decision in *Hansen* in finding endorsement, and rather, required "substantial steps." *Thompson,* 95 F.3d at 436 (citing *Johnson,* 63 F.3d at 1133). In *Hansen,* the only involvement by the employer was providing a booklet that encouraged the employees to consider the program and to employ a full time employee benefits administrator to accept claim forms and submit them to the insurer. *Hansen,* 940 F.2d at 977. The Fifth Circuit determined that this was endorsement and the plan fell under ERISA. *Id.*

In *Thompson,* the Sixth Circuit noted that the employer "contributed nothing toward its employees' participation in the policy, participation in the policy was completely voluntary, and [the employer] received no consideration in connection with the policy." *Thompson,* 95 F.3d at 435. The Sixth Circuit stated that the issue was "what, in the absence of these other considerations, constitutes 'endorsement' within the meaning of 29 C.F.R. § 2510.3-1(j)." Here, as discussed above, this Court determines that the evidence indicates that the Professional Association paid Plaintiff's premiums. In *McNeil,* the Fifth Circuit stated that the plan did not fall within the ERISA safe harbor because the evidence established that the partnership contribut-

ed to the plan. In *McDonald,* the Fifth Circuit examined broadly whether the safe-harbor provisions applied and concluded that "[b]ecause [the employer] paid the insurance premiums, it was not [exempt from ERISA]." *McDonald,* 60 F.3d at 236. Therefore, the fact that the Professional Association paid the premiums for the Plaintiff is a compelling factor in finding that the third element of the safe harbor provision is not satisfied.

Other additional factors also supplement the finding that the third element is not satisfied. The Plaintiff and her co-shareholders could have obtained coverage individually, administered the premiums by themselves, and paid their own premiums. Instead, they pursued coverage through the Professional Association, which paid their premiums obtained a 15% discount, and obtained increased coverage that they normally would not have received. The combination of these various factors indicates that the Professional Association went beyond merely collecting premiums through payroll deductions. Tito states that a list bill arrangement only required a single billing address and that the discount could have been received by neighbors, members of the same church, etc. *See* Dkt. No. 65, Ex. C–1 at 8. Though the evidence indicates that Plaintiff received a 15% list bill discount, Plaintiff and her co-shareholders chose to apply for the discount through the Professional Association. Plaintiff also argues that a Cigna memorandum indicated that a higher coverage was offered because a competing insurance company offered the same amount of coverage to the Plaintiff. Dkt. No. 65 at 20 (citing Dkt. No. 65, Ex. D at 6). However, Defendants' evidence is more persuasive and the Court determines that the Defendants provided the excess coverage due to the involvement of the Professional Association. *See* Dkt. No. 62, Ex. 6.

## C. Establishment or Maintenance by an Employer Intending to Benefit Employees

The Court determined that it was unclear (1) whether the Professional Association was the source of financing for the plan for the benefit of all of its employees or merely deducted its employees pay to acquire a group discount; and (2) who performed the administrative duties necessary to establish or maintain the disability benefits plan. Dkt. No. 39 at 10.

### 1. Legal Principles

As explained above, the third element of the *Meredith* factors asks whether the plan "satisfies the primary elements of an ERISA 'employee benefit plan'—establishment or maintenance by an employer intending to benefit employees." *Meredith v. Time Ins. Co.,* 980 F.2d 352, 355 (5th Cir.1993). The third element of *Meredith* is essentially two separate elements as defined in the statute: "1) whether an employer established or maintained the plan; and 2) whether the employer intended to provide benefits to its employees." *MDPhysicians,* 957 F.2d at 183.

### 2. Parties' Positions

Defendants argue that a plan may be created through the purchase of insurance by the employer. Dkt. No. 62 at 19. Defendants contend that "ERISA can apply even though the insurer is responsible for determining whether and to what extent benefits are payable." *Id.* at 20 (citing *Memorial Hosp. Sys.,* 904 F.2d at 243). Defendants argue that the Professional Association had more involvement than the employer in *Hansen* in which the Fifth Circuit found that the employer established or maintained a plan. *Id.* at 21 (citing *Hansen,* 940 F.2d at 977–78). For example, Defendants state that the Professional Association:

> made disability coverage available to all of its shareholders, enabled them to apply for coverage on a group basis, participated in the negotiation for the coverage, agreed to receive and process the premium invoices, prepared the checks for those premiums, ensured that its checks were remitted on time, received and processed premium-refund checks, handled the bookkeeping for all of those transactions, obtained a 15% premium discount by virtue of its involvement, and may well have paid all of the premiums itself.

*Id.*

Defendants argue that ERISA only requires that a plan is established or maintained, and under the disjunctive test, "ERISA can continue to apply even though there are subsequent changes in the component parts of an ERISA-governed benefit plan." *Id.* at 23 (citing *Massachusetts Cas. Ins. Co. v. Reynolds,* 113 F.3d 1450, 1453 (6th Cir.1997)).

Plaintiff did not specifically address the third element in the *Meredith* factors; rather, Plaintiff noted various factual mischaracterizations by the Defendants. *See* Dkt. No. 65.

Defendants reply that Plaintiff did not devote a separate section for the third element of the Fifth Circuit's test for ERISA applicability. Dkt. No. 66 at 12. Defendants aver that Plaintiff did not "refute Defendants' arguments that (1) an employer can create a plan through the purchase of insurance (Opening Brief at 19–20), and (2) numerous courts (including the Fifth Circuit) have held that ERISA can apply even though an insurer is responsible for determining whether and to what extent benefits are payable (*id.* at 20)." *Id.* at 12–13.

### 3. Analysis

The Court has already established above that the Professional Association paid Plaintiff's premiums and was thus the source of financing. The Fifth Circuit in

*Hansen* stated that "[t]o determine whether an employer 'established or maintained' an employee benefit plan, 'the court should [focus] on the employer ... and [its] involvement with the administration of the plan'" *Hansen*, 940 F.2d at 978 (quoting *Gahn v. Allstate Life Ins. Co.*, 926 F.2d 1449, 1452 (5th Cir.1991)).

The Professional Association administered the plan by receiving and processing premium invoices and preparing checks for the premiums. *See* Dkt. No. 62, Ex. 4 at 20; Dkt. No. 62, Ex. 5 at 11 (explaining the receipt of premium invoices). The Professional Association also handled the bookkeeping for the checks. *See* Dkt. No. 62, Ex. 4 at 19–21 (excerpt from Plaintiff's deposition describing bookkeeping). As stated above, Plaintiff and her associates received a list bill discount, which the doctors could have done through any address but they chose to do it through their Professional Association and maintained through the Professional Association. *See* Dkt. No. 62, Ex. 4 at 33–34. The Plaintiff also received extra coverage as a result of the employer's involvement. *See* Dkt. No. 62, Ex. 6 (declaration of Ronald Graff). As explained in *Memorial Hospital System*, the employer was "solely responsible under the policy for submitting monthly premiums" and the fact that the employer's administrative functions were minimal was found to be "perfectly keeping with its intent that [the insurance company] administer the plan as well as insure it." 904 F.2d at 243.

In *McDonald*, the Fifth Circuit determined that the employer "established or maintained" the plan by "purchasing the insurance, selecting the benefits, identifying the employee-participants, and distributing enrollment and claim forms." *McDonald*, 60 F.3d at 236 (citing *Memorial Hosp. Sys.*, 904 F.2d at 240). Here, the Professional Association paid the premiums and allowed the co-shareholders to pick their coverage. The Professional Association then administered the bookkeeping and ensured that the premiums were paid. Thus, in answering the two issues from the Prior Order, the Court determines that the Defendants were the source of financing and performed the functions of administering the plan. In answering the two questions posed by the *MDPhysician* court, the Court determines that an ERISA plan was established and maintained and that the Defendants intended to provide a benefit to its employees. The Court concludes that the third *Meredith* factor is met.

## V. CONCLUSION

For all of the foregoing reasons, the Court determines that ERISA is **APPLICABLE**.